522 S.E.2d 180

**FAIRMONT SPECIALTY SERVICES,**
**Appellant,**

v.

**The WEST VIRGINIA HUMAN RIGHTS**
**COMMISSION and Irma P. Voyle,**
**Appellees.**

No. 25335.

Supreme Court of Appeals of
West Virginia.

Submitted Jan. 12, 1999.

Decided July 16, 1999.

Dissenting Opinion of Justice Davis
July 20, 1999.

Concurring Opinion of Chief Justice
Starcher Nov. 4, 1999.

Nancy W. Brown, Esq., Steptoe & Johnson, Clarksburg, West Virginia, Ancil G. Ramey, Esq., Steptoe & Johnson, Charleston, West Virginia, Attorneys for Fairmont Specialty Services.

Darrell V. McGraw, Jr., Esq., Attorney General, Mary Catherine Buchmelter, Esq., Deputy Attorney General, Charleston, West Virginia, Attorneys for The West Virginia Human Rights Commission.

J. Lawrence Hajduk, Esq., Leslie Crosco, Esq., Hajduk and Associates, P.C., Markleysburg, Pennsylvania, Attorneys for Voyle.

WORKMAN, Justice:

This case is before this Court upon appeal from a final order of the West Virginia Human Rights Commission (hereinafter "Com-

mission") entered on May 28, 1998.[1] In September 1996, Appellee Irma Voyle filed a complaint with the Commission alleging that her employer, Fairmont Speciality Services (hereinafter "FSS"), unlawfully discriminated against her in violation of West Virginia Code § 5–11–9(1) (1999) by creating or tolerating a hostile work environment based on discriminatory actions relative to her Mexican–American ancestry. While the administrative law judge ("ALJ") determined that the alleged discriminatory conduct towards Ms. Voyle was unwelcome; that such conduct was, at least in significant part, due to Ms. Voyle's Mexican ancestry; and that such conduct was sufficiently severe and pervasive to alter Ms. Voyle's conditions of employment and to create a hostile or abusive work environment, he ruled in FSS' favor, after determining that FSS met its burden of demonstrating that it took prompt remedial action reasonably calculated to end the harassment. Upon review, the Commission reversed the administrative law judge's decision, finding that Mr. Fluharty's harassment was not "trivial ... [or] isolated" and that "[u]nder these circumstances, management should have known about the harassment much earlier." The Commission further found that FSS did not prove by a preponderance of the evidence that it took prompt remedial action reasonably calculated to end the harassment, and awarded Ms. Voyle $3,277.45 for incidental damages and $11,406.18 for attorney fees and costs. FSS seeks a reversal of the Commission's final order.

FSS contends that the Commission erred by substituting its findings of fact for those of the ALJ and concluding that FSS failed to take prompt remedial action reasonably calculated to address the reported harassment. Alternatively, FSS contends that both the Commission and the administrative law judge erred as a matter of law by concluding that

the alleged harassment resulted in a discriminatory hostile or abusive environment and that FSS failed to meet its burden of proving that prompt remedial measures were taken. After a complete review of the record in this case, as well as the arguments presented by counsel, we affirm the decision of the Commission.

## I. Standard of Review

The standard under which the Commission reviews a decision of an administrative law judge is established by statute.[2] West Virginia Code § 5–11–8(d)(3) states that the "commission shall limit its review upon such appeals [from the administrative law judge's decision] to whether the administrative law judge's decision is:

(A) In conformity with the constitution and the laws of the state and the United States;

(B) Within the commission's statutory jurisdiction or authority;

(C) Made in accordance with procedures required by law or established by appropriate rules of the commission;

(D) Supported by substantial evidence on the whole record; or

(E) Not arbitrary, capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."

With regard to this Court's review of the factual findings made by the Commission, we stated in syllabus point one of *West Virginia Human Rights Commission v. United Transportation Union, Local No. 655*, 167 W.Va. 282, 280 S.E.2d 653 (1981), that "West Virginia Human Rights Commission's findings of fact should be sustained by reviewing courts if they are supported by substantial evidence or are unchallenged by the parties."[3] While the substantial evidence rule applies to findings of fact rendered by an

---

1. W.Va.Code § 5–11–11 (1999) provides that any final order of the Commission may be directly appealed to this Court.

2. In *Paxton v. Crabtree*, 184 W.Va. 237, 400 S.E.2d 245 (1990), we recognized that the scope of review is traditionally set by statute. *Id.* at 242, 400 S.E.2d at 250 n. 6 (citing for example, W.Va.Code § 29–5–4(g)).

3. We made clear that this standard still controls our review of the findings of the Commission with the statutory amendment that allows direct appeal from the Commission to this Court. *See Kanawha Valley Reg'l Transp. Auth. v. West Virginia Human Rights Comm'n*, 181 W.Va. 675, 677, 383 S.E.2d 857, 858 n. 1 (1989) (discussing 1987 amendments to W. Va.Code § 5–11–11 and stating that substantial evidence standard still controls appellate review of agency findings of fact).

administrative agency such as the Commission, legal rulings made by the Commission are subject to de novo review. *See Ruby v. Insur. Comm'n,* 197 W.Va. 27, 475 S.E.2d 27 (1996).

In *Morris Memorial Convalescent Nursing Home, Inc. v. West Virginia Human Rights Comm'n,* 189 W.Va. 314, 431 S.E.2d 353 (1993), we discussed what is meant by "substantial evidence":

> such relevant evidence, on the whole record, as a reasonable mind might accept as adequate to support a finding; it must be enough to justify a refusal to direct a verdict, if the factual matter were tried to a jury. 'This is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.' The reviewing court is not entitled to reverse the finding of the trier of the facts simply because the reviewing court is convinced that it would have weighed the evidence differently if it had been the trier of the facts.

*Id.* at 316, 431 S.E.2d at 355 (quoting *Brammer v. West Virginia Human Rights Comm'n,* 183 W.Va. 108, 111, 394 S.E.2d 340, 343 (1990)). In addition, we have repeatedly observed that "[t]he credibility of witnesses . . . [are] for the hearing examiner to determine." *Westmoreland Coal Co. v. West Virginia Human Rights Comm'n,* 181 W.Va. 368, 373, 382 S.E.2d 562, 567 n. 6 (1989); *see also Martin v. Randolph Bd. of Educ.,* 195 W.Va. 297, 304, 465 S.E.2d 399, 406 (1995) (stating that "ALJ's credibility determinations are binding unless patently without basis in the record").

The Rules of Practice and Procedure Before the West Virginia Human Rights Commission provide, in part:

> Within sixty (60) days after the date on which the notice of appeal was filed, the Commission shall render a final order affirming the decision of the administrative law judge, or an order remanding the mat-

ter for further proceedings before an administrative law judge, or a final order modifying or setting aside the decision.

6 W.Va.C.S.R. § 77–2–10.6 (1996). The administrative rules further provide that

> the Commission shall limit its review to whether the administrative law judge's decision is:
>
> In conformity with the Constitution and laws of the state and the United States;
>
> Within the Commission's statutory jurisdiction or authority;
>
> Made in accordance with procedures required by law or established by appropriate rules or regulations of the Commission;
>
> Supported by substantial evidence on the whole record; or
>
> Not arbitrary, capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

*Id.* at 77–2–10.8.a to –10.8.e.

▮ Thus, while the Commission and this Court must give deference to the findings of fact of the ALJ, the Commission is not precluded from making additional findings of fact that are not in conflict with those reached by the ALJ. In addition, the Commission may determine that the ALJ's decision is clearly not supported by substantial evidence on the whole record. With these standards in mind, we examine the findings of fact reached by the ALJ, and to the extent they were properly modified, those of the Commission.

## II.   Factual Background

▮ Because one of the chief contentions raised by FSS it that the Commission improperly substituted its judgment for the ALJ with regard to the findings of fact, we examine the facts in that context. By way of initial background, there is no dispute that Irma Voyle began working for FSS in April 1990. Ms. Voyle is a United States citizen of Mexican ancestry.[4] In 1995, FSS directed Ms. Voyle to train Scott Fluharty, a co-

4. Ms. Voyle is a native of El Paso, Texas. As a child, she learned Spanish as her primary language and English as a second language.

employee.[5]  The first time Ms. Voyle reported a problem with Mr. Fluharty was on March 16, 1995.  This initial conflict between Ms. Voyle and Mr. Fluharty is described in the ALJ's findings of fact numbers 8 through 10:

8.  The trouble between Ms. Voyle and Mr. Fluharty began in or about March 1995.  Ms. Voyle's calendar containing her contemporaneous handwritten notes ... has an entry on 16 March 1995 stating "Talk to Jeff about Butch [Fluharty].  *Laziness* and *ugliness.*  Said he'd talk to him." (Emphasis in original).  "Jeff" refers to Jeff Noechel, respondent's production coordinator, a management position.  Based on a review of the testimony, and after an assessment of credibility, I find as fact that 16 March 1995 was the first time that Ms. Voyle brought Mr. Fluharty's treatment of her to the attention of management.  To the extent this finding is contradicted by the testimony of Mr. Fluharty and/or Mr. Noechel, both of whom identify a date in April 1995 as the fi[r]st reported incident of alleged harassment, their testimonies are rejected.

9.  Ms. Voyle testified that the incident that occurred on or about 16 March 1995 consisted of Mr. Fluharty "cussing me and calling me a Mexican bitch and telling me he wasn't going to do what a Mexican told him to do."  This is the "ugliness" mentioned in her calendar.

10.  Ms. Voyle's testimony was inconsistent as to whether she told Mr. Noechel on 16 March 1995 about the anti-Mexican aspect of Mr. Fluharty's invective.  He denies that she did.  Based on the evidence of record, and after an assessment of credibility, I find as fact that while she did report Mr. Fluharty for cussing and general obnoxious behavior, she did not report his ethnic references to Mr. Noechel or any management official on this occasion.  This finding is based primarily on her admissions under cross examination.

As to finding number 10, the Commission found that "The ALJ ignores the evidence of

record that Ms. Voyle indeed specifically reported that she had been harassed and that a proper investigation by the respondent would have revealed the full extent of Mr. Fluharty's behavior toward Ms. Voyle."  Close examination of this provision of the Commission's order reveals, however, that this finding was not contrary to the ALJ's finding except perhaps implicitly by attaching more credibility to Ms. Voyle's claim that she mentioned the ethnic slur specifically.

In finding number 13, the ALJ basically concludes that Mr. Fluharty called Ms. Voyle a "Mexican bitch" when he threw labels on her desk on April 9, 1995, but that she neither recorded the ethnic slur on her calendar nor reported it to management.  The Commission, on the other hand, found that Ms. Voyle had reported the harassment to her immediate supervisor, Mr. Charlie Parker.  Mr. Parker acknowledged that Ms. Voyle had reported problems with Mr. Fluharty somewhere in the neighborhood of twenty-five times.  Mr. Parker testified that only one of these complaints concerned an ethnic slur and that Ms. Voyle made such complaint to him in April 1996.

The Commission found that the ALJ's findings of fact numbers 21 and 40 were clearly wrong.  Those findings centered upon the ALJ's conclusion that, based on Ms. Voyle's diary and the lack of entries therein, it was unlikely that Mr. Fluharty could have made "repeated" insulting references to complainant's ancestry in 1995, and that Ms. Voyle exaggerated the number of times (approximately 100) that she maintained she was called a "Mexican bitch."  The ALJ's characterization of Ms. Voyle's testimony that she made 100 complaints as exaggeration, and whether she in fact made anywhere close to that number of reports, is not necessary to our resolution of this case.  It is, thus, not necessary to conclude that the ALJ's finding of fact on this issue was not supported by the evidence to reach the decision herein.

Several of the Commission's conclusions go not toward altering or amplifying upon the ALJ's findings of fact, but merely further

---

**5.**  Although Mr. Fluharty was hired by FSS in 1991, he and Ms. Voyle had not previously

worked together.

bolster the ALJ's determination that Mr. Fluharty did issue discriminatory ancestral epithets towards Ms. Voyle. This conclusion, however, is in no way in conflict with that of the ALJ, who also found and concluded that: (1) the conduct towards Ms. Voyle was unwelcome; (2) that such conduct was, at least in significant part, due to Ms. Voyle's Mexican ancestry; and (3) that such conduct was sufficiently severe and pervasive to alter Ms. Voyle's conditions of employment and to create a hostile or abusive work environment.

The Commission made one additional finding of fact not in conflict with the ALJ's to the effect that Ms. Voyle made over twenty-five complaints concerning Mr. Fluharty to her immediate supervisor, Mr. Charlie Parker. Other than this, the Commission did little to alter the findings of fact of the ALJ. That finding is supported by substantial evidence in the form of the unrefuted testimony of Mr. Parker.[6] Thus, the assignment of error raised by FSS that the Commission substituted its judgment for the ALJ's is not borne out by an examination of both sets of findings and we find it to be without merit. For purposes of our review, we determine that the ALJ's findings of fact, as well as the Commission's finding of fact concerning the reports made to Mr. Parker, are supported by substantial evidence.

Next we examine the contention of FSS that the Commission erred in concluding that it failed to take prompt remedial action reasonably calculated to address the reported harassment. In order to address this issue, a continued exposition of the facts is in order. Upon a review of ALJ's findings of fact 8, 9, and 10, it appears that although the ALJ concluded that Ms. Voyle did not tell Mr. Noechel, the production coordinator, about the anti-Mexican aspect of Mr. Fluharty's invective, she did report the "cussing and general obnoxious behavior." According to the ALJ's findings of fact, Mr. Noechel told Ms. Voyle that he would talk to Mr. Fluharty about his behavior. The ALJ further found that on March 30, 1995, Mr. Fluharty told

Ms. Voyle that he [Mr. Fluharty] had been spoken to by Mr. Noechel, but that he [Mr. Fluharty] didn't "give a f---. I can do what I want." The next day, according to the ALJ, Ms. Voyle told Mr. Noechel about Mr. Fluharty's comment and also "told him [Mr. Noechel] it would be the last time I would complain about him [Mr. Fluharty]." This exchange should have signaled FSS that the talk with Mr. Fluharty had not been effective.

Within only a short time after the March 1995 incident, it came to Ms. Voyle's attention through a co-worker, Ginny Lawrence, that Mr. Fluharty was "running his mouth in the lunchroom." He allegedly made threats "to knock [complainant] down and make sure I never came up." The ALJ found that these comments had been made and that although they were undoubtedly disturbing and frightening, he rejected the testimony that they included references by Fluharty referring to Voyle as a "fat Mexican bitch."[7] Ms. Voyle reported this April 1995 incident to Mr. Noechel and to the Prosecuting Attorney of Marion County. At that time, Mr. Noechel told Ms. Voyle that Mr. Fluharty had admitted that he was intentionally trying to irritate her. Thus, FSS was again put on notice not only of employee harassment, but also of its intentional nature. Ms. Voyle also reported this incident to plant manager David Roberts, who asked Noechel to conduct an investigation. Mr. Roberts' note, made in conjunction with his involvement in this incident, is revealing in that it refers to reports having been made as to both the second incident (label-throwing) and the third incident (lunchroom threat). Furthermore, Mr. Roberts' note reflects

> Talked with J.A.N. [Jeff Noechel] to see what he's aware of, he's heard some rumbling but wasn't aware it was serious. I instructed J.A.N. to have a talk with Butch, it can be non-threatening, questioning attitude, but makes it clear to him we've heard rumors, we can't see why they'd be true, but we want to insure that

---

6. Mr. Parker testified, however, that only one of Ms. Voyle's complaints concerning Mr. Fluharty's treatment of her concerned an ethnic slur.

7. The ALJ made this conclusion based on the fact that the individual, Ginny Lawrence, who reported the incident to Ms. Voyle did not testify to any ethnic comments being made by Mr. Fluharty.

there is *"No Question"* that it is our position that we will not tolerate threats, jokes or not, to any employee.

The ALJ seems to have relied on the fact that this note makes no reference to any ethnic slur or language, but ignores the fact that a gender-based slur was made at the outset. Furthermore, the very fact that Ms. Voyle was of Mexican ancestry, coupled with the gender remark, should at minimum have placed the employer on notice to inquire further into whether the harassment that was occurring was based on unlawful discriminatory conduct. It is also of concern that the FSS management personnel seemed to be interested in going to great lengths not to offend Fluharty (suggesting a "non-threatening, questioning attitude"), even in the context of his having made threats in the workplace of physical violence against Ms. Voyle. Mr. Noechel went so far as to counsel Ms. Voyle as to her intolerance of mediocre or poor work on Mr. Fluharty's part, even though management had charged her with his training. At this juncture, the employer's concern for Mr. Fluharty's feelings and/or rights stands in stark contrast to their lack of sensitivity to Ms. Voyle's rights.

On approximately July 6, 1995, Ms. Lawrence again reported to Ms. Voyle that Fluharty was talking about her in the lunchroom. Ms. Voyle, however, contacted neither Mr. Roberts nor Mr. Noechel about this statement. Whether this was one of the more than twenty-five complaints she made to supervisor Charlie Parker is unclear.

It was Ms. Voyle's testimony that on or about September 15, 1995, Mr. Fluharty came to her work area and again verbally harassed her, by calling her a Mexican bitch. Although she alleged that she reported this comment to Mr. Parker, the ALJ, both on the basis of the absence of a recordation in her diary about this incident, and on the basis of Mr. Parker's testimony that only one complaint had been made to him (in 1996) concerning remarks on her ancestral heritage, found it "unlikely" that Ms. Voyle had reported the remark. The ALJ does, however, accept Ms. Voyle's contention (absent the ethnic slur) that she reported the September 15th incident to Mr. Parker. Thereafter, approximately a week later, Ms. Voyle asked Mr. Parker what he had done about it, and he told her he had forgotten to report it.

The abuse of Ms. Voyle by Mr. Fluharty continued into 1996. There were lunchroom incidents in March 1996 and April 1996, the first of which Ms. Voyle did not report, and the second of which she reported to Mr. Parker. It had been reported to Ms. Voyle that Fluharty in this April 1996 incident had once again called her a Mexican bitch, although the ALJ is unclear in his findings of fact with respect to whether he found she reported this particular aspect of the incident. However, the ALJ did find that on April 8, 1996, Ms. Voyle did report the incident of April 6th to Mr. Noechel who promised to investigate. The same day, he spoke to two employees who confirmed that Fluharty had referred to complainant as "a lazy Mexican." Also on April 8, 1996, Mr. Noechel spoke with Mr. Fluharty who admitted making the remark. Mr. Noechel recorded his conversation with Mr. Fluharty as follows (in part):

> I told Butch that there are rules concerning making ethnical [sic] remarks in our handbook. He said that he realizes that he shouldn't have said the things that he said. I told him that I would inform Dave Roberts of this upon his return and that we would get back to him. I also told him to keep his remarks to himself and to stay clear of Irma. He said that he would do so.

At this point, Ms. Voyle had reported the harassment numerous times, with neither an extensive investigation by the employer into the scope of the problem, nor any real sanction. While the ALJ found that Ms. Voyle had not to this point reported the ethnic slur, she clearly had, reported the gender slur [8].

---

8. Conduct such as use of the "N" word to describe an African–American, the "C" word to describe women, the terms "Sic," "W.P." or "Jap" to describe those of other ancestral heritages, or other racial, sexual or ethnic pseudonym, intended to denigrate others, cannot be tolerated in the workplace. They are the type of outrageous discriminatory conduct that may be considered to be of an aggravated nature such that the threshold for it to be actionable is much

On April 10, 1996, Noechel reported back to complainant regarding his investigation. She informed him that she had reported the incident to the NAACP and that all she wanted "was for Butch to stay away from her." Mr. Noechel told Ms. Voyle that he had adjusted their work schedules so that, for at least several days, Mr. Fluharty would be arriving for work after she left. Still, however, no sanction was applied to Mr. Fluharty. Finally, in a May 1996 conference, Ms. Voyle was informed by Mr. Roberts that, as a result of the April 6, 1996, incident, Fluharty had been given an in-plant suspension with no loss of pay. Roberts characterized this action as a final warning. Although the nature of an "in-plant suspension without loss of pay" is not further described, it appears to constitute nothing more than another warning. It should have been clear to FSS that their "warnings" were grossly inadequate to effectively remedy the problem.

Mr. Fluharty apparently was not to be deterred. In July 1996, he began sitting near Ms. Voyle and staring intently at her in the lunchroom. She again informed both Mr. Noechel and Mr. Parker. In August, she recorded two additional instances of Fluharty sitting near her and staring, although the ALJ found no indication that she reported the August incidents. A co-employee, Phil Tarley, signed a statement on August 20, 1996, which said in its entirety: "Butch said that Irma was a dumb Mexican bitch and that the company was paying her for nothing. That he had to come in on overtime to do Irma's job." Mr. Tarley testified that he could not remember when Mr. Fluharty made this statement.

In September 1996, Mr. Roberts informed Mr. Fluharty that Ms. Voyle had filed a complaint with the West Virginia Human Rights Commission. Even at this juncture, the employer made no progressive discipline. Mr. Roberts advised Mr. Fluharty to avoid all contact with Ms. Voyle and to avoid discussing her with others. Again, the same employer response and the same result. Once again not to be deterred, Fluharty re-

sumed his lunchroom staring episodes on October 10 and 11, 1996. Feeling threatened, Ms. Voyle did not bother to contact the employer on this occasion. After all, it had been going on for almost two years. She had made approximately twenty-five complaints to her immediate supervisor and all the ones set forth herein to Mr. Noechel and Mr. Roberts. This time, she contacted her attorney.

At this juncture, Mr. Roberts inquired further and ascertained from employee Judith Hickman that Mr. Fluharty had been engaging in intimidating behavior towards Ms. Voyle in the lunchroom. Several male employees claimed that they couldn't recall, one way or the other, if Mr. Fluharty was harassing or intimidating Ms. Voyle. One male, however, noted that if Ms. Voyle "was his mother he would be concerned. He also said that he'd talked with Butch and told him to back off. . . ." The abuse had reached the point that other co-workers were even attempting to intervene in Ms. Voyle's behalf. On October 18, 1996, Mr. Fluharty was finally discharged.

### III. Discussion

Both the ALJ and the Commission agreed that Ms. Voyle was the victim of unlawful discriminatory conduct on the part of her co-worker, Mr. Fluharty; that it was sufficiently severe and pervasive to alter Ms. Voyle's conditions of employment; and that Ms. Voyle gave sufficient notice to management of Fluharty's behavior to trigger the employer's duty to take prompt remedial action. *See Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (stating elements of hostile work environment cause of action). While this Court has never addressed the elements for an ancestral-based hostile work environment case, the elements necessary to prove that case are the same as those required to prove sexual harassment, but for the distinguishing nature of the offensive conduct at issue. *See Hanlon v. Chambers,* 195 W.Va. 99, 464 S.E.2d 741 (1995) (stating elements of sexual harassment hostile work environment cause

lower than more subtle forms of discrimination which cumulatively cause conduct to be action-

able under the Human Rights Act.

of action). Accordingly, we hold that to establish a claim for ancestral discrimination, under the West Virginia Human Rights Act, West Virginia Code §§ 5–11–1 to –20 (1999) based upon a hostile or abusive work environment, a plaintiff-employee must prove that: (1) that the subject conduct was unwelcome; (2) it was based on the ancestry of the plaintiff; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment; and (4) it was imputable on some factual basis to the employer. *See also Amirmokri v. Baltimore Gas and Elec. Co.,* 60 F.3d 1126 (4th Cir.1995).

█ The ALJ and the Commission do not part company in any significant manner until they reach the issue of whether the employer took sufficiently prompt and effective remedial action calculated to end the harassment. Because this is a legal conclusion, our standard of review is de novo. *See Ruby,* 197 W.Va. at 29, 475 S.E.2d at 29; *but see Howard v. Burns Bros., Inc.,* 149 F.3d 835, 841 (holding that determination of whether employer took prompt and adequate remedial action is often factual issue). In fact, it is a legal conclusion inextricably bound to the facts, for it is only in the context of a close and detailed review of all the facts and circumstances of the case that the adequacy of an employer's remedial response can be determined. The facts necessary to the resolution of this issue revolve around the question of what FSS knew or had reason to know with regard to illegal discriminatory conduct towards Ms. Voyle, what actions FSS took to inquire into and address the problem, and whether those actions were adequate under our law.

█ An employer's liability in harassment cases is tied to the nature of its response to a complaint of discriminatory conduct. As the Eighth Circuit stated in *Carter v. Chrysler Corp.,* 173 F.3d 693 (8th Cir.1999), a harassment plaintiff must show that the employer "knew or should have known about the harassment and failed to take prompt remedial action reasonably calculated to stop the harassment." *Id.* at 702. The court in *Carter* offered the following as a list of factors useful in evaluating "the reasonableness of remedial measures": "the options available

to the employer, possibly including employee training sessions, transferring the harassers, written warnings, reprimands in personnel files, or termination, and whether or not the measures ended the harassment." *Id.* (citation omitted).

As this Court stated in *Hanlon v. Chambers,* 195 W.Va. 99, 464 S.E.2d 741 (1995):

When the source of harassment is a person's co-workers and does not include management personnel, the employer's liability is determined by its knowledge of the offending conduct, the effectiveness of its remedial procedures, and the adequacy of its response. Thus, an employer that has established clear rules forbidding sexual harassment and has provided an effective mechanism for receiving, investigating and resolving complaints of harassment may not be liable in a case of co-worker harassment where the employer had neither knowledge of the misconduct nor reason to know of it.

*Id.* at 108, 464 S.E.2d at 750. As Justice Cleckley explained in *Hanlon,* "common sense must be applied to the facts in each case to determine whether the employer took direct and prompt action 'reasonably calculated' to end the harassment." *Id.* at 109, 464 S.E.2d at 751 (quoting B. Lindemann & D.D. Kadue, Sexual Harassment in Employment Law 195–96 (1992)).

█ Even accepting the ALJ's conclusion that the Ms. Voyle's original complaint to management did not specify the anti-Mexican reference, there obviously was evidence that Mr. Fluharty used a pejorative word with Ms. Voyle which was based on her gender. The record reflects that the only "cussing" Ms. Voyle reported was the reference to Fluharty's use of the epithet "bitch." That particular word certainly has overtones of gender discrimination, another form of unlawful discrimination under the West Virginia Human Rights Act. When discriminatory conduct unlawful under the West Virginia Human Rights Act, West Virginia Code §§ 5–11–1 to –20, is reported to an employer, the report of such conduct places upon that employer a duty to investigate. Thus, despite the fact that an employee's complaint ultimately sounds in one form of unlawful

discrimination, the fact that the employee brings to the employer's attention conduct of a co-worker involving some other form of discriminatory conduct unlawful under the West Virginia Human Rights Act places upon that employer a duty to investigate. Whether the scope of such an employer investigation of a complaint of unlawful discrimination in the workplace is adequate must be determined by the application of common sense and by what is reasonable under all the circumstances. The adequacy of an employer's response can be measured in part by its effectiveness. Applying this law, we conclude that FSS was placed under a duty to inquire further with respect to the conduct of Mr. Fluharty towards Ms. Voyle based on his reference to her as a "bitch," even absent any report of an ethnic slur. Females whose racial or ethnic heritage place them in a protected class are subject to protection under the West Virginia Human Rights Act for both minority classifications. Frequently, such individuals may be subject to unlawful discrimination as a result both of being female and of being a minority.

▇▇▇▇ While a quantitative analysis concerning the instances of harassment is certainly relevant,[9] it has been recognized that "[t]he more outrageous the conduct, the less frequent must it occur to make a workplace hostile." *Gregory v. Widnall*, 153 F.3d 1071, 1074 (9th Cir.1998). The aggravated nature of discriminatory conduct, together with its frequency and severity are factors to be considered in assessing the efficacy of an employer's response to such conduct. Instances of aggravated discriminatory conduct in the workplace, where words or actions on their face clearly denigrate another human being on the basis of race, ancestry, gender, or other unlawful classification, and which are

clearly unacceptable in a workplace are unlawful, under the West Virginia Human Rights Act, and in violation of the public policy of this State. When such instances of aggravated discriminatory conduct occur, the employer must take swift and decisive action to eliminate such conduct from the workplace. The threshold for the number of instances of such conduct of aggravated or outrageous discriminatory conduct in order for such conduct to be actionable is lower than garden-variety type conduct of a less aggravated nature.

▇▇▇▇ In assessing the effectiveness of an employer's response to unlawful discrimination in the workplace, the scope of the investigation conducted by the employer, once it is on notice of potential discriminatory conduct, is a factor to be considered in determining the adequacy and sufficiency of the employer's response. The First Circuit previously identified the scope of an employer's duty to correct a hostile work environment in *De-Grace v. Rumsfeld*, 614 F.2d 796 (1st Cir. 1980):

It may not always be within an employer's power to guarantee an environment free from all bigotry. He cannot change the personal beliefs of his employees; he can let it be known, however, that ... harassment will not be tolerated, and he can take all reasonable measures to enforce this policy.... But once an employer has in good faith taken those measures which are both feasible and reasonable under the circumstances to combat the offensive conduct we do not think he can be charged with discriminating on the basis of race [or ancestry].

*Id.* at 805.

▇▇▇▇ Factors to examine in determining whether an employer has met its burden to

9. As a general rule "more than a few isolated incidents are required" to meet the pervasive requirement of proof for a hostile work environment case. *Kimzey v. Wal–Mart Stores, Inc.*, 107 F.3d 568, 573 (8th Cir.1997); *see also Harris*, 510 U.S. at 23, 114 S.Ct. 367 (stating that "'mere utterance of an ... epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment to implicate Title VII") (quoting *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)); *Snell v. Suffolk County*, 782 F.2d 1094, 1103 (2d Cir.1986) (requiring "more than a few isolated incidents of racial enmity" for racist comments, slurs, and jokes to constitute hostile work environment); *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir.1994) (holding that "[i]nstead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments"), *cert. denied*, 516 U.S. 826, 116 S.Ct. 92, 133 L.Ed.2d 48 (1995); *Vore v. Indiana Bell Tel. Co.*, 32 F.3d 1161, 1164 (7th Cir.1994) (observing that whether racial slurs constitute hostile work environment depends upon "quantity, frequency, and severity" of slurs).

take prompt remedial action reasonably calculated to end the harassment include, but are not limited by, the gravity of the harm, the nature of the work environment, the degree of acquiescence in the harassment by the supervisors, the promptness of the employer's responsive action, and the apparent sincerity of the employer's actions. *See Snell v. Suffolk County,* 782 F.2d 1094, 1104 (2nd Cir.1986). The Commission considered the actions of FSS against these standards and concluded that the employer's response was inadequate. FSS reasonably should have done far more than it did in investigating the harassing conduct of Mr. Fluharty, and could have determined the pervasive nature of such conduct at a much earlier point in time had it done an adequate investigation. As even the ALJ observed in its order, "[t]his was a close case that could have tipped the other way had respondent not fired Mr. Fluharty after the October 1996 incidents." The ALJ further commented that "[c]learly, the progressive disciplinary approach had started to become ineffective when Mr. Fluharty attempted to intimidate Ms. Voyle in the lunchroom in the presence of witnesses just 30 days after being told to avoid all contact with her." These concerns that the ALJ expressed intimate that under the circumstances of this case, the remedial actions taken by FSS may not have been reasonably calculated to end the harassment. *See Hathaway v. Runyon,* 132 F.3d 1214, 1224 (8th Cir.1997) (holding that employer's subsequent failure to reprimand harassing employee after complaints had been made supported jury's finding of sexual harassment); *cf. Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 432 (7th Cir.1995) (holding that employer's response was sufficient where it "took all reasonable steps to protect" plaintiff once she complained to human resources department, including promptly investigating complaint, instructing offender to cease offensive behavior immediately, placing him on probation, and withholding a salary increase for several months). It further suggests that, but for the firing of Mr. Fluharty, the ALJ would have ruled otherwise. We conclude that the "discipline" imposed against Mr. Fluharty by FSS in the face of repeated complaints was not progressive in nature, as

no meaningful sanction ever was applied to Mr. Fluharty until he was discharged. Furthermore, the ineffectiveness of its continued "warnings" to Mr. Fluharty should have become clear to the employer. Meaningful discipline was not prompt, nor was it reasonably calculated to end the harassment.

Mr. Fluharty's harassing conduct occurred over the course of an eighteen-month period. It occurred in a small physical plant, and the record clearly demonstrates it was common knowledge, especially in the lunchroom, that Mr. Fluharty was harassing Ms. Voyle and that he made ethnic slurs against her, both to her face and to others in the workplace. FSS did too little, too late. After being placed on notice, their investigation was not sufficient and their response was ineffective. Only after more than eighteen months of harassment and only after getting an attorney and filing a complaint did Ms. Voyle get an effective response. Because our review of the Commission's ruling is limited to whether there is substantial evidence to support its conclusion, we cannot conclude that the Commission was in error with regard to its determination that FSS "did not prove by a preponderance of the evidence that it took prompt remedial action reasonably calculated to end the harassment." Accordingly, we uphold the decision of the Commission.

Affirmed.

DAVIS, Justice, dissenting:

(Filed July 20, 1999)

I respectfully dissent to the majority's conclusion that FSS did not take prompt and effective remedial action in response to plaintiff's allegations of hostile work environment. The record reflects an employer well-aware of its obligations to keep its workplace free of discriminatory conduct and further reveals, an employer, who acted with alacrity and concern each time the plaintiff actually made a complaint.

In an obvious effort to make the facts of this case fit the law it created, the majority has omitted numerous facts from its opinion. For example, the majority repeatedly refers to twenty-five separate instances of complaints plaintiff made to her immediate su-

pervisor, Mr. Parker. Yet, the majority fails to disclose the fact that, of these twenty-five complaints, only *one* involved any type of discriminatory reference. Mr. Parker testified that the only time plaintiff voiced concern about Mr. Fluharty's utterance of an ancestral slur occurred in April, 1996. Every FSS employee, and even plaintiff herself, testified that the first time she ever complained to management about an ethnic slur was April 1996. While the majority wishes to paint a picture of a plaintiff who was continuously presenting legitimate complaints of discriminatory conduct to management that were ignored, the record proves otherwise. Mr. Parker's testimony concerning the much-discussed twenty-five complaints was that all but one of these complaints involved instances of petty workplace bickering between two co-employees.[1] In an effort to color FSS as a bad employer, the majority has improperly enhanced the quantitative nature of the complaints made by plaintiff. Moreover, the majority has completely disregarded the critical distinction between those employee complaints that are properly the subject of a discrimination action and thus, require a prompt and effective employer response, and those complaints which do not invoke the protections of employment discrimination law.

Critically, the record reflects and the ALJ properly found, that the first instance when FSS management was placed on notice as to any ethnic slurs having been made by Mr. Fluharty against plaintiff was when plaintiff made management aware of the lunchroom comments that Mr. Fluharty made on April

6, 1998. The response of FSS to plaintiff's complaint concerning this incident reveals an employer intent both on complying with the investigatory requirements imposed upon it and ensuring that this incident would not be repeated. On the very date that plaintiff made FSS aware of Mr. Fluharty's lunchroom invective comments about her (April 8, 1996), her employer immediately launched an investigation into the matter. Mr. Noechel first checked with plaintiff's supervisor, Mr. Parker, who was unaware of the incident, and then spoke with two other employees about the incident. He then confronted Mr. Fluharty, who admitted making the remark,[2] and informed Mr. Fluharty that "it was a very serious offense that he had committed" and that the company had specific rules proscribing such conduct. Mr. Fluharty was advised to stay away from plaintiff, to which he agreed, and he was informed that upon the plant manager's return from vacation, the matter would be further addressed. Mr. Noechel took specific action to separate plaintiff and Mr. Fluharty by altering their work schedules so that they would not be at the plant at the same time for the next several days.

Upon the return of the plant manager, Mr. Roberts, a third-level disciplinary notice[3] was issued to and signed by Mr. Fluharty, which made clear that it was a "final warning" and that further inappropriate behavior would result in "necessary disciplinary action up to and including discharge." While the majority criticizes this discipline as essentially meaningless,[4] the majority fails to appreci-

---

1. Examples of this behavior to which Mr. Parker testified included, "Butch [Fluharty] took my boxes" or "Butch took my fork truck."

2. The majority fails to note that Mr. Fluharty explained, in discussing the matter with Mr. Noechel, that he only made the offensive comments after being baited by other co-employees and that he never meant them nor intended for them to get back to the plaintiff. During this discussion, Mr. Fluharty informed Mr. Noechel that a source of his problem with the plaintiff was her constant criticism of the quality of his job performance. The ALJ found that "[i]t was basically undisputed that complainant was not very tolerant of what she perceived to be mediocre or poor work habits in others."

3. The first two levels are respectively, a verbal warning and a written warning. Level four is an immediate suspension pending discharge and level five is discharge.

4. Despite the fact that the suspension was without a loss of pay, this disciplinary measure is nonetheless a formal measure of discipline. When you consider that this discipline, which indicated that the next step could be discharge, was issued in response to the very first instance of ancestral-based comments, the discipline does not appear the "slap on the wrist" that the majority would have us believe. Moreover, without this formal disciplinary notice, FSS would not have been permitted to discharge Mr. Fluharty in October 1996.

ate the dilemma faced by employers when they are presented with employee complaints. If an employer acts too severely and immediately discharges an employee, it is promptly "rewarded" with a wrongful discharge suit.[5] Moreover, the majority appears completely incognizant of the fact that this complaint concerning the April 6, 1996, lunchroom incident was the *first* such incident which invoked the protections of the West Virginia Human Rights Act ("Act"), West Virginia Code §§ 5–11–1 to –20 (1999). Because plaintiff's cause of action is limited to ancestral discrimination [6] and because the ALJ found,[7] and the record supports this determination, that April 6, 1996, was the first time that FSS was made aware of any ancestral-based comments being made by Mr. Fluharty, the discipline that was issued against Mr. Fluharty on April 23, 1996, is the launching point from which any examination of the appropriateness of FSS's remedial efforts can be analyzed.

The majority's attempt to go back to April 1995 as the first instance of discriminatory conduct for purposes of examining the reasonableness of FSS's actions is without support and against established principles of appellate review. As a rule, this Court does not apply the law in such a fashion as to prejudice the litigants when we depart from well-ensconced legal precepts. *See Bradley v. Appalachian Power Co.*, 163 W.Va. 332, 350, 256 S.E.2d 879, 889 (1979) (discussing need to apply law prospectively where substantial public issues arising from statutory or constitutional interpretations are involved that represent a clear departure from prior precedent). Moreover, it is axiomatic that an employer's obligation to take remedial action in conjunction with employment discrimination matters is prompted by an actual complaint of the subject discriminatory conduct. *See Watts v. New York City Police Dep't*, 724 F.Supp. 99, 108 (S.D.N.Y.1989). Unless the employer had reason to know of the conduct and ignored acting upon such information, the investigatory process required by law does not begin until a complaint has been made. In this case, there is no dispute by even the Commission that the April 1996 lunchroom incident was the first time plaintiff reported ancestral-based discriminatory conduct by Mr. Fluharty. To suggest, as does the majority, that Mr. Fluharty's use of the term "bitch" in April 1995, based on the improper gender connotations associated with that remark, triggered the duty of FSS to employ remedial measures is both specious and clearly misguided. The law is not so one-sided, nor should it be, as to permit a plaintiff to bring a cause of action predicated on one-type of conduct, but to hold the employer liable with regard to its actions for conduct that was *not* the subject of the complaint and was *not* actionable under this State's anti-discrimination laws.

Where the majority goes seriously astray is in its fundamental misconception that anti-discrimination laws were intended to completely eliminate any and all bickering and even profanity from the workplace.[8] As the United States Supreme Court has made clear, "Title VII does not prohibit all verbal or physical harassment in the workplace." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d

---

5. Like many employers who attempt to comply with employment discrimination laws, FSS was in fact sued by Mr. Fluharty for wrongful discharge.

6. This is a key distinction that the majority overlooks.

7. Even the Commission did not find that plaintiff reported discriminatory remarks at an earlier date; the Commission concluded only that FSS could have discovered the discrimination had it conducted a proper investigation.

8. The majority turns a blind eye to the ALJ's finding that in May 1996 plaintiff was informed that, through the investigation FSS conducted into the April 6, 1996, lunchroom incident, it was revealed that she frequently used vulgar language in the workplace. One male employee, Dave Lambert, reported that plaintiff "can be very crude and used filthy language ... she cusses more than any women or men that I've been around." Another co-worker of plaintiff, Ms. Scritchfield, stated that plaintiff always called her "crazy bitch" instead of using her name. FSS management informed plaintiff that she needed to curb her use of profanity in the workplace. The ALJ observed that plaintiff "did not deny using crude and vulgar language."

201 (1998).[9] Rather, it is directed only at prohibited discriminatory conduct. *See id.* As Justice Scalia explained in the context of a same gender sexual harassment claim,

> We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations. 'The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'

523 U.S. at 80, 118 S.Ct. 998 (quoting *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 25, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)); *see also Quick v. Donaldson Co.,* 895 F.Supp. 1288, 1296 (S.D.Iowa 1995), *judgment rev'd on other grounds,* 90 F.3d 1372 (8th Cir.1996) (observing that while "[u]nder Title VII, employers have an affirmative duty to maintain a working 'environment free of discriminatory intimidation, ridicule, and insult[,]'" they do not have a corresponding affirmative duty "to maintain a working environment free of all non-discriminatory juvenile mischief and immature behavior") (quoting *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). Both the Commission and the majority fail to grasp the fact that harassment that is actionable re-

quires "disadvantageous terms or conditions of employment." *Harris,* 510 U.S. at 25, 114 S.Ct. 367 (Ginsburg, J., concurring).[10]

Much of what transpired between plaintiff and Mr. Fluharty, and upon which the majority relies, is either conduct that anti-discrimination laws was never aimed at preventing or does not meet the test of whether "a reasonable person in the plaintiff's position would find [the conduct] severely hostile or abusive."[11] *Oncale,* 523 U.S. at 82, 118 S.Ct. 998. To illustrate, Mr. Parker testified that only one of the twenty-five complaints registered by plaintiff concerning Mr. Fluharty concerned a comment about her ancestry. Thus, the majority wrongly castigates FSS for the other twenty-four complaints with regard to its failure to act. Another critical element of a workplace harassment claim that the majority completely overlooks is the requirement that a plaintiff's work situation be examined through the subjectivity of the individual plaintiff in determining whether the environment was indeed hostile or abusive. *See Harris,* 510 U.S. at 21–22, 114 S.Ct. 367 (stating that plaintiff must show both that offending conduct created an objectively hostile environment and that she subjectively perceived her working conditions as abusive). A simple review of plaintiff's testimony raises a critical question as to whether

---

**9.** This Court has repeatedly pronounced that we analyze cases brought under the Act consistent with the manner in which federal anti-discrimination laws are applied, barring statutory distinctions or other compelling reasons. *See Hanlon v. Chambers,* 195 W.Va. 99, 112, 464 S.E.2d 741, 754 (1995).

**10.** FSS argued that plaintiff offered no testimony that Mr. Fluharty's comments or conduct adversely affected her job performance and that plaintiff similarly offered no evidence that she sought counseling or treatment for work-related stress associated with his comments or conduct. While neither of these factors is determinative on the issue of hostile work environment, it clearly is evidence as to whether the workplace was sufficiently permeated with discriminatory conduct by Mr. Fluharty to have constituted actionable ancestral-based harassment. *See Hathaway v. Runyon,* 132 F.3d 1214, 1223 (8th Cir.1997) (stating that " 'the test is not whether work has been impaired, but whether working conditions have been discriminatorily altered'" and rejecting employer's contention that plaintiff had to offer evidence of medical or psychiatric injury to succeed on her claim) (quoting *Harris,* 510 U.S.

at 25, 114 S.Ct. 367, Scalia, J., concurring); *Harris,* 510 U.S. at 23, 114 S.Ct. 367 (stating that whether harassing conduct at issue "unreasonably interferes with an employee's work performance" is one of five factors to consider in determining whether work environment is hostile).

**11.** Given well-established principles of appellate review which require upholding administrative findings of fact provided such findings were supported by substantial evidence, I do not dissent to the ALJ's determination that a hostile work environment was created by Mr. Fluharty's conduct. Clearly, once ancestral slurs were in fact made, the ALJ could have properly made such a finding. Because the majority wrongfully relies on instances of non-discriminatory conduct to fault FSS for its remedial efforts, I must, however, point out the critical foundational underpinnings for a discrimination claim. It is only through such an examination of discrimination law that the error in the majority's reasoning can be fully appreciated.

plaintiff subjectively viewed her work environment as hostile or abusive. Plaintiff testified that she "wasn't scared of him [Mr. Fluharty]." [12] She stated, further, that "I knew Fluharty was weird, and [when] nobody was around him, he was always in the corner laughing, doing stupid things." In addition, plaintiff testified "I was never around him that much." [13] This was partly because Mr. Fluharty worked straight day shift (7 a.m. to 3 p.m.) and plaintiff worked a rotating twelve-hour shift. Plus, after the initial training of Mr. Fluharty in March 1995, these two employees *never* worked directly with each other. They would encounter each other only in the lunchroom or if one individual specifically sought out the other one. Given this admission concerning their limited contact, it is difficult to view plaintiff's testimony that Mr. Fluharty called her a "Mexican bitch" on one hundred occasions, but only did so out of the presence of other co-employees, with anything but skepticism. The ALJ concluded that plaintiff had clearly exaggerated the number of times Mr. Fluharty had made ethnic slurs against her.[14]

The majority wrongly accepts as facts conclusions that the Commission made in order to reverse the decision of the ALJ. For example, the majority accepts the Commission's conclusion that given the small size of the plant (eighty employees), everyone had to know about Mr. Fluharty's discriminatory conduct. The record, however, is devoid of testimony that supports this self-serving conclusion. Moreover, inherent to this conclusion is a wholesale acceptance of plaintiff's testimony concerning the one-hundred instances of ancestral slurs, concerning which

the ALJ expressly found no credible evidence, and a concomitant dismissal of the evidence offered by FSS that April 1996 was the first time that it was made aware of any ancestral invective involving plaintiff. Another conclusion that the Commission reached was that the absence of *any* reference whatsoever in plaintiff's personal calendar was not indicative of whether Mr. Fluharty had failed to make ancestral slurs on one-hundred occasions.[15] This conclusion simply flies in the face of reason and common sense. It strains credibility to suggest, as the ALJ found, that an individual, such as plaintiff, who made notations correspondent to even the most petty of incidents would have chosen not to denote in some manner multiple instances of ancestral slurs being made against her by Mr. Fluharty.[16]

Were it not for the majority's wrongful reliance on portions of the record without giving any weight to the evidence presented by FSS, it would not have been necessary to discuss the foundational flaws upon which the majority relies in reaching its conclusion. *See supra* note 10. The real crux of this dissent is my firm conviction that the employer in this case took remedial efforts that were both prompt and reasonably calculated to eliminate the harassment at issue. *See Saxton v. AT & T Co.*, 10 F.3d 526, 536 (7th Cir.1993) (stating that while employer could have done more to remedy the effects of the harasser's conduct from plaintiff's perspective, "Title VII requires only that the employer take steps reasonably likely to stop the harassment"). Each and every time that FSS received complaints from plaintiff concerning Mr. Fluharty [17] that involved matters

**12.** This testimony arguably negates whether plaintiff actually felt physically threatened by Mr. Fluharty's comments.

**13.** This testimony clearly went to the critical issue of whether the conduct was "severe or pervasive," *Harris,* 510 U.S. at 22, 114 S.Ct. 367.

**14.** The majority, of course, downplays this lack of credibility finding.

**15.** The Commission decided that because such comments were necessarily insulting in nature, plaintiff would have logically refrained from recording the same.

**16.** ALJ found as a matter of fact

[g]iven that Ms. Voyle made daily entries in her diary/calendar, and given her obvious propensity to record workplace disputes of even a petty nature (e.g. entry on 11 July 1995: "Pudding [her name for employee] said cutting tags was not his job"), I find it very unlikely that Mr. Fluharty could have made repeated insulting references to complainant's ancestry in 1995 without Ms. Voyle making even one entry in her calendar about such ethnic slurs, other than her reference to "ugliness" in March.

**17.** Although the majority implies that Mr. Fluharty had previously engaged in discriminatory conduct with regard to other employees, the record states only that Mr. Fluharty had problems getting along with his co-workers.

other than petty workplace bickering, it promptly looked into the matter.[18] Where those complaints were discriminatory in nature, FSS conducted the thorough investigation that is required by law. To summarize the actions of FSS, as the ALJ expressly found,

(1) when plaintiff first complained of Mr. Fluharty's harassment in March 1995, he was verbally reprimanded by management after it investigated the complaint even though plaintiff made no reference to any remarks based upon her ancestry;

(2) when plaintiff next complained of an April 1995 lunchroom incident, which occurred outside her presence, Mr. Fluharty was given an official verbal warning;

(3) when plaintiff next complained of an April 1996 lunchroom incident, which also occurred outside her presence, Mr. Fluharty was given a "final warning;" and

(4) when plaintiff next reported the "staring" incidents in October 1996, which occurred after Mr. Fluharty had been warned to stay away, Mr. Fluharty was fired.

When the record is properly culled, as reflected by the ALJ's findings above, this case was not one where a plaintiff made repeated complaints of discriminatory conduct and the employer simply looked the other way. To the contrary, on each and every occasion that plaintiff complained to management about non-petty incidents involving Mr. Fluharty, FSS investigated the incident and imposed progressive discipline, from verbal warnings up to and including discharge.

Despite the majority's recitation of the Snell factors for considering whether the employer's remedial efforts were appropriate,[19]

the majority omits reference to specific factual findings that the ALJ made on this issue:

(a) There was no offensive or hostile physical contact;

(b) There was no overt act against plaintiff's physical safety or a threat to do *imminent* bodily harm;

(c) The offensive conduct was infrequent, spread over a period from March 1995 to October 1996, with considerable gaps between some of the incidents;

(d) There was no credible evidence that any supervisor acquiesced in the harassment;

(e) The plant manager, Mr. Roberts, personally involved himself in resolving the issue and appeared sincere in wanting the harassment to stop;

(f) Much, but certainly not all, of the animosity between the two amounted to no more than workplace bickering; and

(g) The efforts of respondent to deal with Mr. Fluharty after *reported* incidents of harassment were sincere and effective.

Thus, rather than the eighteen-month period of continuous harassment that the majority describes, what occurred instead was several incidents followed by lengthy intervals during which no offensive conduct was reported. Critically, within six months of the first instance when FSS was informed by plaintiff of ancestral-based invective, Mr. Fluharty was fired. Downplaying this relatively short-time period, the majority prefers instead to place undue emphasis on the fact that Mr. Fluharty's termination followed plaintiff's filing of a complaint with the Commission.

I wish to make clear that I do not condone the conduct or remarks that Mr. Fluharty made with respect to plaintiff. His behavior

---

18. The majority cites one instance when Mr. Parker apparently indicated to plaintiff that he forgot to report an incident to higher management. Although plaintiff testified that she accorded no ill-will to Mr. Parker with regard to this failure to report, the majority would have us believe that this was evidence of management's complicity in the harassment. The ALJ found that this complaint, based on the entry in plaintiff's calendar—"Butch trying to irritate me"—did not include any ethnic slur. Thus, the failure of Mr. Parker to report the incident, which appears to fall in the same category as the other

previously discussed more "petty" incidents, certainly does not warrant the majority's inference that FSS management ignored or failed to act upon complaints registered by plaintiff.

19. Those factors are: the gravity of the harm, the nature of the work environment, the degree of acquiescence in the harassment by the supervisors, the promptness of the employer's responsive action, and the apparent sincerity of the employer's actions. *See Snell v. Suffolk County*, 782 F.2d 1094, 1104 (2nd Cir.1986).

was clearly offensive as ethnic epithets, just like racial slurs, are repugnant to civilized society and should not be tolerated in the workplace, whether through direct or indirect means. What the majority ignores, however, is the fact that federal as well as state anti-discrimination laws are not codes of civility. *See Oncale*, 523 U.S. at 81, 118 S.Ct. 998; *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 265 (5th Cir.1999) (stating that "Title VII ... cannot guarantee civility in the American workplace but, at its best, inspires prophylactic measures to deter unwanted ... harassment"). Employers, much as they would like, simply cannot rid the workplace of all instances of inappropriate employee behavior. *See Quick*, 895 F.Supp. at 1296. This Court has previously recognized in *Hanlon* that where employers have in place clear policy that both proscribes harassment in the workplace and establishes "an effective mechanism for receiving, investigating, and resolving complaints of harassment," "the employer has done all that it can do to prevent harassment, and the employer cannot be charged with responsibility for the victim's failure to complain." 195 W.Va. at 108, 464 S.E.2d at 750.

The majority has effectively thwarted this critical limitation on imposing vicarious liability on employers for co-worker harassment. Despite the fact that FSS had written rules in place prohibiting workplace harassment and rules which governed complaint making, the majority holds FSS liable for conduct that occurred before FSS was ever made aware or had reason to be aware of any ancestral nature to the "animosity" between plaintiff and Mr. Fluharty. *See also Indest*, 164 F.3d at 265 (discussing how prompt complaints by a plaintiff "can thwart the creation of a hostile work environment"). Despite the clear pronouncement in *Meritor* that employers should not be held automatically or strictly liable for hostile work environment cases, the majority's decision appears to do just that. 477 U.S. at 72, 106 S.Ct. 2399. As FSS perceptively cautioned, the majority's decision to uphold the Commission's findings puts this State's employers on notice that unless they immediately terminate any employee found to have used, even on a single occasion, any derogatory term based on race,

gender, ethnicity, ancestry, or other protected classification, they will be found to be in violation of this State's anti-discrimination laws. And we wonder why it is so difficult to attract new employers to this State?

I am authorized to state that Justice MAYNARD joins me in this dissent.

STARCHER, Chief Justice, concurring:

(Filed Nov. 4, 1999)

I fully concur with the majority opinion. I write separately to address several factors that are involved in this case in greater detail.

Administrative Law Judge Mike Kelly found that the appellee, Ms. Voyle, had been harassed by her co-worker, Mr. Fluharty, and that the harassment involved and was based in substantive part upon Ms. Voyle's national origin. The ALJ specifically stated:

> I conclude as a matter of law that Irma P. Voyle showed by a preponderance of the evidence that Mr. Fluharty's conduct towards her was unwelcome. While it is fair to state that Ms. Voyle "gave as good as she got" when it came to average workplace bickering over duties and equipment, and perhaps at times enjoyed being verbally confrontational with co-workers, Mr. Fluharty's conduct clearly exceeded the normal and became *frightening, menacing, insulting and most unwelcome.*

(Emphasis added.)

The ALJ also stated:

> I conclude as a matter of law that Mr. Fluharty's conduct, at least in significant part, was due to Ms. Voyle's Mexican ancestry. I base this conclusion on his use of the term "Mexican" in a disparaging and insulting tone *when threatening Ms. Voyle's physical safety* and when discussing her with co-workers.

(Emphasis added.)

Then, the ALJ concluded:

> I conclude as a matter of law that Mr. Fluharty's conduct was sufficiently severe and pervasive to alter Ms. Voyle's conditions of employment. In making a determination on this issue, I apply by analogy

the HRC regulations on sexual harassment, and particularly 6 W.Va.C.S.R. § 77–4–2, which provides that:

> 2.4. In determining whether alleged sexual harassment in a particular case is sufficiently severe or pervasive, the Commission will consider;
>
> 2.4.1. Whether it involved unwelcome physical touching;
>
> 2.4.2. Whether it involved verbal abuse of an offensive or threatening nature;
>
> 2.4.3. Whether it involved unwelcome and consistent sexual innuendo or physical contact; and
>
> 2.4.4. The frequency of the unwelcome and offensive encounters.

In applying these criteria, the ALJ concluded that Fluharty's actions and threats against Ms. Voyle were unwelcome and that they consisted of threats against her person, bizarre antics, hostility and anger, and that they were sufficiently severe to cause Ms. Voyle, who the ALJ characterized as a "reasonable person," to see her work environment as abusive. He also found that the behavior "clearly exceeded the normal and became frightening, menacing, insulting and most unwelcome." The ALJ also found that Fluharty's conduct, at least in significant part, was due to and directed at disparaging Ms. Voyle's Mexican ancestry.

These findings of fact by the ALJ have been upheld by the Commission. It was only the ALJ's legal conclusion as to employer liability for the actions of a co-worker that was overturned by the Commission. The ALJ, stating that it was a "close call that could have tipped the other way," concluded that the employer "did the right thing" by ultimately firing the harasser. The Commission concluded to the contrary—that the employer's firing the harasser, 18 months after the first report of harassment, did not constitute the swift remedial response that is required by the legislatively promulgated regulations and previous case law on this issue.

On that issue (that the employer's response to illegal harassment was not consistent with the law) the Commission reversed the ALJ. The Commission awarded Ms. Voyle $3,277.45 in incidental damages and $11,406.18 in attorney's fees.

The dissent misunderstands the majority opinion's language, about what should have triggered an adequate investigation of the illegal harassment in which Mr. Fluharty was engaging.

The ALJ's recommended decision, the record and exhibits, and even the employer's position are in accord, and there is no dispute, that FSS first knew that Scott Fluharty had called Irma Voyle a "bitch" in the early Spring of 1995. The Commission further concluded that the words "Mexican bitch" were also known of at that time. Everyone agrees that the words "Mexican bitch" and "lazy Mexican" were used later, and that Mr. Fluharty's actions became steadily more threatening, menacing and harassing—to such a degree that he was ultimately fired.

What the majority opinion says is that the employer was on notice of entirely unacceptable harassing language and conduct early on, and that had FSS done even a minimally adequate investigation, FSS would have appreciated the full extent of Mr. Fluharty's harassment. That is, the repeated, menacing use of hostile and derogatory words, such as "bitch," put the employer on notice that the workplace was tainted with unacceptable harassment. The discussion of gender slurs in the majority opinion is purely directed to the employer's duty to investigate, and not to a substantive claim of gender discrimination. Nothing in the majority decision grants Ms. Voyle a claim for gender discrimination.

The dissent also suggests that the majority opinion would create a strict liability standard unlike anywhere in the country, and would force employers to fire an alleged harasser after only one report of an "inappropriate" term. This completely misstates the majority opinion, which is soundly based on previous cases from this Court.

The standard for employer liability for the actions of co-worker harassment has been set out in the Commission's legislatively promulgated regulations in the analogous area of sexual harassment, that state:

> With respect to conduct between fellow employees, an employer is responsible for

acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) *knew* or *reasonably should have known of such conduct,* or expressly or impliedly authorized or ratified such conduct. As a defense an employer may show that it took timely and appropriate corrective action regarding such conduct.

*West Virginia Human Rights Commission's Legislative Rules Regarding Sexual Harassment,* 6 W.Va.C.S.R. § 77–4–3.2. (1992) (emphasis added). Subsequent to the promulgation of these regulations, the United States Supreme Court in *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), have recognized that such "timely and appropriate action" defenses constitute affirmative defenses that must be pled and proven.

In Syllabus Point 8 of *Hanlon v. Chambers,* 195 W.Va. 99, 464 S.E.2d 741 (1995), this Court recognized the duty of an employer to provide a workplace free from discriminatory harassment, from whatever source. Further, the Court stated that if the harassment is perpetrated by someone other than a supervisor, an employee can state a claim for relief against an employer on the basis of a hostile work environment created by one or more subordinate employees if the employer *knew or should have known* about the offending conduct, and failed to take "swift and effective measures" reasonably calculated to end the harassment. *Hanlon,* Syllabus Point 9.

This Court in *Conrad v. ARA Szabo,* 198 W.Va. 362, 480 S.E.2d 801 (1996), dealt with a scenario much like that of this case, in relation to harassment based on gender. We addressed a dispute between an employee's assertions that she reported sexual harassment, and management's assertion that she did not specifically state that it was "sexual harassment," by looking at the behavior and the context of the workplace. We stated, "Moreover, to the extent plaintiff complained about the sexually loaded remarks and touching, the employer's awareness of the gender basis for the harassment could be reasonably inferred." 198 W.Va. at 373, 480 S.E.2d at 812. The *Conrad* opinion went on to state:

[k]nowledge of work place misconduct may be imputed to an employer by circumstantial evidence if the conduct is shown to be sufficiently pervasive or repetitive so that a reasonable employer, intent on complying with ... [the West Virginia Human Rights Act] would be aware of the conduct.

Similarly, the record in the instant case shows that an employer intent on complying with the West Virginia Human Rights Act would have been aware early on that Mr. Fluharty was seriously harassing Ms. Voyle, and upon a minimal investigation would have been aware that the harassment contained a substantial component of ethnic baiting. The record also clearly shows that FSS did not fire Fluharty until *after* Ms. Voyle filed her case with the Commission, and *after* they met in Charleston at a fact-finding conference.[1] In fact, it was only *after* Ms. Voyle filed her claim that management instructed Fluharty not to speak to her. It was only when Fluharty blatantly harassed her again, that he was finally terminated, *more than 18 months after he first harassed her and the employer first knew of the harassment.*

The testimony from co-workers who heard Fluharty's pejorative and vile language about Ms. Voyle not only bolstered her claim that he did indeed use such language, but also that it created a hostile environment. The evidence is clear that she heard plenty of it. Testimony on what Ms. Voyle did not hear actually supports her credibility. Such evidence is relevant and was properly accepted. In this case, the ALJ referred to testimony about Fluharty's ranting outside the hearing of Ms. Voyle to confirm the tie to her nation-

---

1. The notes of this meeting of management with Fluharty, dated September 6, 1996, record the following advice to Fluharty: "Scott, I thought you should know if you haven't already heard thru rumor mill that we had to go to Chas. to an investigation hearing on the matter of Irma

Voyle's harassment claims.... I'd like to offer some friendly advice, I'd suggest you avoid any contact with Irma at all.... *Advise us if you feel as though anyone is harassing you in any way."* (Emphasis added.)

al origin.[2] Also, such testimony shows conclusively that the employer should have known what was happening in its workplace.

The dissent's citation to *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998), is misplaced. *Oncale* does not offer any new standard of what constitutes a hostile environment. It merely reiterates the standard previously set out in a long line of cases from the United States Supreme Court beginning with *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Single, isolated remarks have never been found to themselves create a hostile environment. However, this case is not about a casual, inappropriate remark. In fact, one of Ms. Voyle's co-workers testified, and the ALJ credited this testimony, that if it were his mother being treated this way, he would have worried for her safety. Fluharty's behavior went on over a period of a year and a half. The employer clearly knew was going on and did not effectively investigate or act to see that it stopped. The employer's defense that they took swift remedial action was an affirmative defense. They never proved that defense. The Commission correctly found and this Court has affirmed that Ms. Voyle should prevail on her claim against the employer.

Finally, it is worth noting just what is at stake and at issue in this case. Mrs. Voyle had to file a claim with a government agency to get any relief from her employer. After an arduous hearing process, she obtained a very modest and appropriate damages award of several thousand dollars.

The employer chose to exercise its absolute right to fully litigate the claim, including an appeal to this Court. The employer unsuccessfully argued before the Commission and before this Court that it did nothing negligent or wrong. The employer has strongly criticized the position taken by this Court regarding what sort of behavior triggers an employer's duty to investigate and take corrective action.

Here is the employer's position, as set forth in the employer's petition for rehearing:

Are West Virginians people of such hypersensitivity that, unlike in every other state, where this rule would not apply, every unkind word must be immediately eradicated from the workplace? Life in the modern workplace, regrettably, can often result in co-worker tension. It is not uncommon for such tensions to arise even in an appellate court. The occasional, isolated use of such terms as "bitch," "bastard," or "son-of-a-bitch," is an important method of relieving such workplace tension, of "blowing off steam." If these terms, as the majority opinion appears to dictate, are completely banned from the West Virginia workplace, it is entirely possible that workers will resort to non-verbal forms of expressing their frustrations, fears, anxieties, and aggressions.

Workplace violence, unfortunately, is a fact of life in contemporary society. Women disproportionately suffer from such workplace violence. Frequently, the perpetrators of workplace violence are those employees who kept their frustrations, fears, anxieties, and aggressions just below the surface, eventually erupting in a violent frenzy. Perhaps if those employees were better able to verbalize their concerns, their passive/aggressive tendencies would not have tragically resulted in the death or serious injury of their coworkers.

In FSS's view, the majority opinion, by completely banning the use of terms such as "bitch," "bastard," or "son-of-a-bitch" from the workplace, will only contribute to increased workplace violence. Although Fluharty threatened violence and used inappropriate language to deal with his frustrations regarding Voyle's constant criticisms of his work, Fluharty never acted upon such threats. If Fluharty had worked in an environment where he knew that any verbal expression of such frustrations might result in his discharge, FSS firmly believes that it would have been

---

**2.** Mr. Fluharty apparently liked to "vent" in front of co-workers about his physical threats against Ms. Voyle. In these ranting, he used the pejorative national origin-based language.

more likely that Fluharty may have expressed those frustrations in physical terms.

Incredibly, the employer seriously argues in the foregoing quoted passages that the results of the majority opinion will be *more workplace physical violence against women.* In my 25 years on the bench, I have heard a lot of stupid "parading the horribles," but this bizarre argument may "take the cake."

Applying this twisted logic to the home front, I suppose that it's good for Dad and Mom, when stressed, to occasionally call little Johnnie or Janie some horrible, obscene name—so as to prevent "physical" child abuse!

I resoundingly disagree with the employer's argument.

Toleration of unwelcome degrading slurs and taunts does not prevent violence—it leads to violence. And in my opinion, one serious complaint to an employer by a female employee of being called a "bitch" triggers an absolute duty on an employer to investigate, and to take swift corrective action to prevent further occurrences.

The majority opinion does our State a great service, in firmly repudiating the employer's absurd position that an occasional unwelcome "bitch" (or worse) in the workplace is a healthy thing—or put another way, that vicious language should be tolerated, and even welcomed—to protect women from violence worse than mere words.

I am pleased that our Court, through the words of my esteemed former colleague Justice Margaret Workman, has spoken forcefully in this case. I wholeheartedly concur.

I am authorized to state that Justice McGRAW joins in this concurrence.