IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2022 Term

_____

No. 21-0267

_____

FILED

**November 3, 2022**

**released at 3:00 p.m.**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

WANDA KEENER and KATHERINE ASBURY
Plaintiffs Below, Petitioners,

v.

CLAY COUNTY DEVELOPMENT CORPORATION,
Defendant Below, Respondent.

_____

Appeal from the Circuit Court of Clay County
The Honorable Richard Facemire, Judge
Case No. 18-C-6

AFFIRMED

_____

Submitted: September 13, 2022
Filed: November 3, 2022

Walt Auvil, Esq.
Kirk Auvil, Esq.
The Employment Law Center, PLLC
Parkersburg, West Virginia
Counsel for Petitioners

M. Andrew Brison, Esq.
The Law Office of M. Andrew Brison,
PLLC
Charleston, West Virginia
Counsel for Respondent

JUSTICE WOOTON delivered the Opinion of the Court.

JUSTICE ARMSTEAD, having been disqualified, did not participate in the decision of this case.

JUDGE HOKE sitting by temporary assignment.

**SYLLABUS BY THE COURT**

1.     "A circuit court's entry of summary judgment is reviewed *de novo*." Syl. Pt. 1, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1994).

2.     Familial status is not a protected group for purposes of an employment discrimination claim under the West Virginia Human Rights Act, W. Va. Code §§ 5-11-1 to -9 (2022).

3.     "A statutory provision which is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect." Syl. Pt. 2, *State v. Epperly*, 135 W. Va. 877, 65 S.E.2d 488 (1951).

4.     "In the absence of any definition of the intended meaning of words or terms used in a legislative enactment, they will, in the interpretation of the act, be given their common, ordinary and accepted meaning in the connection in which they are used." Syl. Pt. 1, *Miners in Gen. Grp. v. Hix*, 123 W. Va. 637, 17 S.E.2d 810 (1941), *overruled on other grounds by Lee-Norse Co. v. Rutledge*, 170 W. Va. 162, 291 S.E.2d 477 (1982).

5.     As used in the West Virginia Human Rights Act, West Virginia Code § 5-11-2 (2022), ancestry means discrimination based on some characteristic like race, ethnicity, or national origin that is passed down by lineal descendants.  In the context of

employment, familial status is not included among the groups entitled to protection by the Human Rights Act.

6.     "Where an employee seeks to establish a permanent employment contract or other substantial employment right, either through an express promise by the employer or by implication from the employer's personnel manual, policies, or custom and practice, such claim must be established by clear and convincing evidence."  Syl. Pt. 3, *Adkins v. Inco Alloys Int'l, Inc.*, 187 W. Va. 219, 417 S.E.2d 910 (1992).

7.     "An employee handbook may form the basis of a unilateral contract if there is a definite promise therein by the employer not to discharge covered employees except for specified reasons." Syl. Pt. 6, *Cook v. Heck's Inc.*, 176 W.Va. 368, 342 S.E.2d 453 (1986).

8.     "A promise of job security contained in an employee handbook distributed by an employer to its employees constitutes an offer for a unilateral contract; and an employee's continuing to work, while under no obligation to do so, constitutes an acceptance and sufficient consideration to make the employer's promise binding and enforceable."  Syl. Pt. 5, *Cook v. Heck's Inc.*, 176 W.Va. 368, 342 S.E.2d 453 (1986).

9.     "An employee handbook which contains a clear and conspicuous disclaimer of job security will preserve the at-will status of the employment relationship."

Syl. Pt. 8, *Mace v. Charleston Area Med. Ctr. Found., Inc.*, 188 W. Va. 57, 422 S.E.2d 624 (1992).

10. "An employer may protect itself from being bound by any and all statements in an employee handbook by placing a clear and prominent disclaimer to that effect in the handbook itself." Syl. Pt. 5, *Suter v. Harsco Corp.*, 184 W. Va. 734, 403 S.E.2d 751 (1991).

**WOOTON, Justice:**

The petitioners, Wanda Keener ("petitioner Keener") and Katherine Asbury ("petitioner Asbury"), appeal the order entered by the Circuit Court of Clay County, West Virginia, on March 5, 2021, granting summary judgment to respondent Clay County Development Corporation ("CCDC") in regard to petitioners' claims of discrimination in violation of the West Virginia Human Rights Act ("the Act"), West Virginia Code §§ 5-11-2 and -9 (2022), and breach of an implied employment contract. The petitioners argue that the circuit court erred: 1) in its findings that ancestral discrimination is duplicative of the Act's protections against national origin and ethnic discrimination and that ancestral discrimination does not include discrimination based on familial status; 2) in its findings that the "Clay County Development Corporation Employment Guide" ("the Employment Guide") did not form an implied contract between the petitioners and the CCDC, and that the CCDC was within its rights to terminate petitioners pursuant to other terms of the handbook even if it had formed a contract; and 3) in its finding that the petitioners were at-will employees who could be terminated for any nondiscriminatory reason. Upon our careful review of the briefs, the parties' arguments, the appendix record, the applicable law, and all other matters before the Court, we affirm the circuit court's decision.

## I. Facts and Procedural Background

The CCDC is a nonprofit organization that provides services to senior citizens in Clay County, including in-home and community-based services, through federal

1

and state monies, Medicaid, and various grants. Petitioner Keener worked for the CCDC for thirty years in several positions but spent the last twenty years as a filing clerk. Petitioner Asbury, petitioner Keener's sister, worked for the CCDC for forty years and had the title "3B Project Director." The petitioners were also the sisters of Pamela Taylor, the CCDC's former Executive Director. Ms. Taylor was initially suspended and ultimately terminated from her employment with the CCDC after she made the following post on Facebook in November of 2016, which gained national attention: "It will be refreshing to have a classy, beautiful, dignified First Lady in the White House [referring to former First Lady Melania Trump]. I'm tired of seeing an Ape in heels [referring to former First Lady Michelle Obama]."

As a result of Ms. Taylor's post, the CCDC was investigated and monitored by the State of West Virginia Bureau of Senior Services ("Bureau") and the Appalachian Area Agency on Aging ("AAA").[1] In December of 2016, the Bureau and the AAA

---

[1]Leslie McGlothlin was the Interim Executive Director of the CCDC appointed in November, 2016, after Ms. Taylor's termination. Prior to this appointment, Ms. McGlothlin served as the CCDC's payroll clerk in which her responsibilities included payroll, payroll taxes, bill processing and payment. According to Ms. McClothlin's affidavit:

> Eunice Thomas, CCDC Board President, advised Robert Roswall, Commissioner West Virginia Bureau of Senior Services and Romona Stanley, Executive Director Appalachian Area Agency on Aging, in writing on November 14, 2016, that the CCDC "was at a crossroad" and asked their assistance and guidance related to the actions and conduct of its then suspended Executive Director.

launched an investigation into the CCDC's policies, procedures, and finances. By letter dated December 14, 2016, both Robert Roswall, the Bureau's Commissioner, and Romana McNeely-Stanley, AAA's Director, informed the CCDC that these two agencies were at the CCDC "to monitor your agency's programs and policies and procedures." Specifically, in accordance with the Service Provider conditions,

> "[t]he Service Provider agrees to cooperate with the AAA and assist in any efforts undertaken or approved by the Bureau, the AAA or Administration on Aging (AoA) to monitor and/or evaluate its programs. The Bureau, AAA or AoA shall, if requested, have access to all documents relating to the operation of the Service Provider, including but not limited to, documents providing information relating to the following: payroll, tax, travel, purchasing, financial management, and any internal or external audit information generated by the Service Provider or third party. Any Service Provider receiving Grants through the Bureau shall make full and complete disclosure in a timely manner of any and all financial, operational, and/or administrative information, if requested by the Bureau, AAA or AoA. Failure to do so shall result in suspension of the Grants and may lead to termination of the Grants."

According to Ms. McGlothlin, during the course of the investigation and audit a significant debt of approximately $250,000.00 was discovered in the CCDC's budget. This debt was comprised of unpaid payroll taxes with associated penalties and interest, Medicaid reimbursements due to overpayment to the CCDC, and various outstanding bank loans. Further, it was discovered that during 2016, the CCDC received several "Notice of Intent to Seize ('levy') Property or Rights Property" from the Internal Revenue Service ("IRS") related to the CCDC's failure to pay payroll taxes. In addition to this debt, the CCDC had an ongoing semi-monthly payroll obligation of approximately

3

$60,000 to $75,000.  At the end of 2016, there was only $33,221.96 in the organization's checking account.[2]

Ms. McGlothlin further averred that during the Bureau's and AAA's involvement with the CCDC, "there was emphasis on aggressively reducing the CCDC's debt and addressing the various outstanding IRS payments, penalties, and interest, as well as repaying the State of West Virginia for previous Medicaid overpayments made to the CCDC." Further, based on information from West Virginia Bureau of Senior Services Commissioner Roswall, she stated that the CCDC's contracts were in jeopardy - which cast doubt on the continuing viability of the organization.  Finally, Ms. McGlothlin averred that in 2016, the petitioners "were the two highest paid non-professional employees at the CCDC.  Wanda Keener was paid $46,597.20 and Katherine Asbury was paid $72,360."

On December 21, 2016, the CCDC Board of Directors ("Board") met and voted to execute a contract with AAA to manage the organization for a six-month period. Further, the Board voted to approve the "involuntary separation of both" of the petitioners, the two highest paid employees, from employment with the CCDC.  The petitioners were terminated on December 22, 2016.  Ms. McGlothlin stated that on the date of discharge,

---

[2] Ms. McGlothlin also averred in her affidavit that out of concern regarding the CCDC's "ability to continue to pay its employees at the end of December 2016, the organization was required to obtain a line of credit in April of 2017, in the amount of $20,500 to ensure its ability to meet its ongoing payroll obligations."  She further stated that the line of credit was "for the sole purpose of being able to guarantee wage payments to its employees so that services provided to Clay County Senior Citizens could continue."

most of petitioner Asbury's "job responsibilities were being performed by other employees." Indeed, both of the petitioners' respective job duties were absorbed by the remaining employees and their positions were never filled.

Critically, the information provided by Ms. McGlothlin in her affidavit was confirmed by the CCDC's corporate representative (and then-current Executive Director, Stephanie Duffield) in a 30(b)(6) deposition taken by the petitioners. *See* W. Va. R. Civ. P. 30(b)(6).

With specific regard to the petitioners' termination, the CCDC had a policy and procedure manual, the Employment Guide, in effect at the time of the events which gave rise to the subject of this litigation.[3] There is an introduction on the third page of the Employment Guide directed "**To the Employee:**" which conveys that this document "is designed to provide information and direction on personnel matters and to assure fair and equal treatment to all CCDC employees." At the bottom of this page – a page that contains seventy-six words in total – is the following language: "**Note-Receipt of this Employment Manual does not constitute an employment contract with this agency**." Also, in the

---

[3] While Ms. McGlothlin stated that the CCDC adopted a new Personnel Policies and Procedures Handbook ("the Handbook") at the December 21, 2016, meeting, the petitioners dispute that the Handbook was properly adopted prior to their discharge from employment. The CCDC disagreed with the petitioners' position below, but chose to proceed under the Employment Guide as controlling for the resolution of the issues raised herein.

section of the Employment Guide entitled "USE OF THE MANUAL," the following language is found: "[T]he manual should be used as a guide in dealing with agency personnel matters." Significantly, there is no term of employment set out in the manual.

The Employment Guide also provides for two classifications of involuntary termination. The first is "Positive Dismissal," which is defined as a termination "based on circumstances beyond the employee's control." The second is "Negative Dismissal," which is based upon behavior that is controlled by the employee. The applicable causes for an involuntary termination which are relevant to this case are also set forth in the Employment Guide as follows:

**D.    INVOLUNTARY TERMINATION**

. . . .

**2.    Causes for Involuntary Termination**

**(1)    Positive Termination**

. . . .

**b.    Insufficient Funding**

Termination of an employee may be necessary prior to the time indicated in the work plan when there is a short fall in funds, or the program is defunded.

**c.    Reorganization and Discontinuance of a Particular Position or Area of Service**

Termination of an employee (except when on extended sick leave) may result when reorganization

6

and discontinuance of a particular position or area of service occurs.

The CCDC contends that the petitioners were involuntarily terminated under the "Positive Termination" category because their termination arose out of circumstances beyond their control, i.e., the CCDC's financial situation. Thus, the petitioners were terminated pursuant to the "Insufficient Funding and Reorganization and Discontinuance of a Particular Position or Area of Service" sections of the "Positive Dismissal" section in the Employment Guide. The petitioners' positions were dissolved, their work duties were easily absorbed by others, and the dissolution of these positions resulted in a savings to the non-profit organization in excess of $115,000.00 per year.

Following their termination, the petitioners filed a lawsuit against the CCDC, alleging violations of the Act, West Virginia Code §§ 5-11-2 and -9, and breach of an implied employment contract. After a period of discovery, the CCDC moved for summary judgment.[4] The CCDC argued that the petitioners were not discriminated against based on their ancestry or national origin or any membership in a protected class. In this regard, both the petitioners testified in their respective depositions that their ancestors were from America and petitioner Keener testified that she was not fired because of some lineage she

---

[4] The CCDC filed its motion for summary judgment on April 28, 2020, and the petitioners filed their response on May 12, 2020.

7

had with some other nationality. The CCDC also argued that the petitioners were not

discriminated against based upon their familial status. Finally, the CCDC argued that the

petitioners were at-will employees who could be terminated for any nondiscriminatory

reason; that they could not prevail on their theory of a breach of an implied contract in

connection with the Employment Guide because it failed to suggest or imply that an

employee either has a promise of job security or employment for a fixed-term; and that no

contract existed because the disclaimer in the Employment Guide was sufficient to prevent

the formation of a contract.

The petitioners responded that ancestry discrimination was the basis of their

termination in that Ms. Taylor, *see* text *supra*, was their sister.[5] The petitioners further

---

[5] In support of their claim that they were terminated because of their familial relationship with Ms. Taylor, the petitioners relied upon petitioner Asbury's testimony that asserted then-CCDC Board President, Ms. Thomas, advised her that she (Ms. Thomas) was instructed by both Ms. Roswall and Ms. McNeely-Stanley to fire the petitioners and Ms. Taylor. Petitioner Asbury testified that she was told that she could either resign or be fired, and when she refused to resign she was informed that she and petitioner Keener would be terminated. Petitioner Keener was not privy to this meeting between petitioner Asbury and Ms. Thomas.

Petitioner Asbury also recounted that during this meeting Mr. Roswall called Ms. Thomas and yelled at her to get out of the meeting immediately because she had no business speaking with petitioner Asbury. Ms. Thomas replied that she had spoken with the attorney for the Board of Directors for the CCDC, Andrew Brison, who had told her she could speak with petitioner Asbury to offer the arrangement mentioned above.

Critically, while the petitioners rely upon this testimony to demonstrate the CCDC's intent to terminate them because of their relationship with their sister, Ms. Taylor, neither Mr. Roswall nor his staff, who interviewed various CCDC employees as part of their investigation and monitoring of the CCDC, were employees of the CCDC or otherwise

asserted, in what can fairly be described as conclusory fashion, that the CCDC Employment Guide constituted a contract due to inadequate disclaimers therein. Specifically, they contended that the "small disclaimer is inadequate to defeat Plaintiffs' implied contract under West Virginia law[]" and that there was a "dispute as to whether the facts proved or admitted in this case are such to constitute an agreement binding the parties." Finally, the petitioners contended that CCDC failed to meet the necessary burden of proof to sustain a grant of summary judgment.

By order entered March 5, 2021, the circuit court granted the CCDC's motion for summary judgment. With respect to the petitioners' claim that the Act was violated as a result of discrimination based upon ancestry, specifically, their familial relationship with Ms. Taylor, the court found that "[i]t is undisputed that Plaintiffs were born and raised in the United States, are Caucasian, [and] complain of no disabilities"; and that the petitioners "acknowledged in their depositions that they were not discriminated against on the basis of their race, religion, color, sex, age, blindness, or disability." The court concluded that "ancestry discrimination does not include discrimination based upon a family relationship. Ancestry has a broader meaning than just a relationship to one specific other person." Accordingly, the court determined that the petitioners' claims were not actionable under the Act.

---

affiliated with the CCDC. Further, the petitioners failed to provide any evidence or law to support the notion that Mr. Roswall's actions and conduct in the exercise of his State-mandated official duties as the Bureau's Commissioner could be imputed to the CCDC.

9

In regard to the petitioners' claims that the CCDC breached an implied contract as a result of their termination, the circuit court found that the uncontradicted evidence was that at the end of 2016 and the beginning of 2017 the CCDC suffered from "a large financial debt" that exceeded $250,000.00, and that it "did not have sufficient funding to cover its ongoing payroll obligations." The court also expressly found that the petitioners presented "no evidence or countervailing affidavit to contradict" the following:

> 16. Mrs. McGlothlin's affidavit further stated that Plaintiffs were the highest paid non-professional employees at CCDC with a combined total salary in excess of One Hundred Fifteen Thousand Dollars ($115,000.00) per year.
>
> 17. It is also set forth in the McGlothlin affidavit that neither of Plaintiffs' employment positions were replaced, and their job duties were absorbed by other employees.

Further, the circuit court found that it was undisputed that the Employment Guide had a "clear" disclaimer at the bottom of page three. The court recognized the petitioners' argument that because the Employment Guide contained a progressive disciplinary process, which the petitioners contended had to be followed before an employee could be discharged, an implied contract was formed with each employee. However, the court found that the Employment Guide contained no terms that reasonably can be construed to promise job security to the petitioners. In regard to the progressive disciplinary process, the court determined that "Plaintiffs' discharge was unrelated to any conduct that would trigger the disciplinary process[.]" Succinctly stated, the petitioners' involuntary termination was "a Positive Dismissal" based on financial circumstances beyond the petitioners' control. Therefore, the court concluded, the Employment Guide did not form a contract for

10

employment, the petitioners were at-will employees, and accordingly they could be terminated for any nondiscriminatory reason.

This order forms the basis for the petitioners' appeal.

## II. Standard of Review

On appeal, "[a] circuit court's entry of summary judgment is reviewed *de novo*." Syl. Pt. 1, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1994). Further, we have stated that under our summary judgment standard,

> a party seeking summary judgment must make a preliminary showing that no genuine issue of material fact exists. This means the movant bears the initial responsibility of informing the circuit court of the basis of the motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. However, the movant does not need to negate the elements of claims on which the nonmoving party would bear the burden at trial.

*Powderidge Unit Owners Ass'n v. Highland Props., Ltd.*, 196 W. Va. 692, 698-99, 474 S.E.2d 872, 878-79 (1996). If a moving party meets this initial burden,

> the nonmovant must go beyond the pleadings and contradict the showing by pointing to specific facts demonstrating a "trialworthy" issue. To meet this burden, the nonmovant must identify specific facts in the record and articulate the precise manner in which that evidence supports its claims. As to material facts on which the nonmovant will bear the burden at trial, the nonmovant must come forward with evidence which will be sufficient to enable it to survive a motion for directed verdict at trial. If the nonmoving party fails to meet this burden, the motion for summary judgment must be granted.

*Id*. at 699, 474 S.E.2d at 879.  Under the foregoing principles, we address the issues before us.

### III.  Discussion

### A.  Ancestry Discrimination

The petitioners argue that the circuit court erred in finding that ancestral discrimination is duplicative of the West Virginia Human Rights Act's protections against national origin and ethnic discrimination,[6] and more specifically that it does not include discrimination based on familial relation.  The petitioners contend it is possible for an individual to be the victim of ancestry discrimination based solely on his or her familial

---

[6] Generally,

> [i]n order to make a prima facie case of employment discrimination under the West Virginia Human Rights Act, W.Va. Code § 5-11-1 *et seq*. (1979), the plaintiff must offer proof of the following:
>
> (1) That the plaintiff is a member of a protected class.
>
> (2) That the employer made an adverse decision concerning the plaintiff.
>
> (3) But for the plaintiff's protected status, the adverse decision would not have been made.

Syl. Pt. 3, *Conaway v. E. Associated Coal Corp.*, 178 W. Va. 164, 358 S.E.2d 423 (1986).

12

status, without any consideration of their ethnicity or national origin. In support of this theory, they ask this Court to hold that that "ancestry" includes "sibling or familial status" under the Act. In contrast, the CCDC argues that "ancestry employment discrimination protection has never been extended to 'siblings'" and that West Virginia law does not recognize "familial status" in the employment law context, because "[f]amilial status is simply not the kind of innate characteristic that anti-discrimination laws like the West Virginia Human Rights Act were enacted to protect."

First, it is clear that the Legislature did not expressly designate "familial status" as a basis for discrimination in the employment context. In relevant part, West Virginia Code section 5-11-2, entitled "Declaration of policy" sets forth this State's public policy as follows: "Equal opportunity in the *areas of employment and public accommodations* is hereby declared to be a human right or civil right of all persons without regard to race, religion, color, national origin, ancestry, sex, age, blindness or disability." *Id*. (emphasis added). In contrast, the statue further provides that "[e]qual opportunity in *housing accommodations or real property* is hereby declared to be a human right or civil right of all persons without regard to race, religion, color, national origin, ancestry, sex, blindness, disability *or familial status*." *Id*. (emphasis added). In short, while the Legislature recognized that "familial status" could be a basis for a claim of discrimination in regard to housing accommodations and real property, the list of bases for a claim of discrimination in the employment context does not include "familial status." *See id*. Applying a longstanding, basic principle of statutory construction to the issue before us,

13

we reiterate that "[i]t is not for this Court arbitrarily to read into [a statute] that which it does not say. Just as courts are not to eliminate through judicial interpretation words that were purposely included, we are obliged not to add to statutes something the Legislature purposely omitted." *Banker v. Banker*, 196 W.Va. 535, 546-47, 474 S.E.2d 465, 476-77 (1996) (citing *Bullman v. D & R Lumber Co.*, 195 W.Va. 129, 464 S.E.2d 771 (1995); *Donley v. Bracken*, 192 W.Va. 383, 452 S.E.2d 699 (1994)); *see also State ex rel. Frazier v. Meadows*, 193 W.Va. 20, 24, 454 S.E.2d 65, 69 (1994) ("Courts are not free to read into the language what is not there, but rather should apply the statute as written."). Consequently, we hold that familial status is not a protected group for purposes of an employment discrimination claim under the West Virginia Human Rights Act, W. Va. Code §§ 5-11-1 to -9 (2022). Our holding in this regard is compelled by the indisputable fact that the Legislature specifically and purposefully excluded familial status from the Act in regard to "areas of employment." *Id*. § 5-11-2.

Next, we examine petitioners' claim that even though familial status is not expressly included in the Act for purposes of employment discrimination, it is encompassed within the term "ancestry" which is undefined in the Act. *See W. Va. Inst. of Tech. v. W. Va. Hum. Rts. Comm'n*, 181 W. Va. 525, 529, n.6, 383 S.E.2d 490, 494 n.6 (1989) ("We note that *W. Va. Code*, 51-11-3, as amended, does not contain any definitions of 'national origin' or 'ance[]stry.'"). Given the lack of any statutory definition for the term "ancestry," we again apply well-established rules of statutory construction to ascertain the meaning of the word. In this regard, we have previously held that "[a] statutory

14

provision which is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect." Syl. Pt. 2, *State v. Epperly*, 135 W. Va. 877, 65 S.E.2d 488 (1951); *accord* Syl. Pt. 2, *Crockett v. Andrews*, 153 W. Va. 714, 172 S.E.2d 384 (1970) ("Where the language of a statute is free from ambiguity, its plain meaning is to be accepted and applied without resort to interpretation."). Moreover, we have held that "[i]n the absence of any definition of the intended meaning of words or terms used in a legislative enactment, they will, in the interpretation of the act, be given their common, ordinary and accepted meaning in the connection in which they are used." Syl. Pt. 1, *Miners in Gen. Grp. v. Hix*, 123 W. Va. 637, 17 S.E.2d 810 (1941), *overruled on other grounds by Lee-Norse Co. v. Rutledge*, 170 W. Va. 162, 291 S.E.2d 477 (1982). Further, "[i]t is a fundamental principle of statutory construction that the meaning of a word cannot be determined in isolation, but it must be drawn from the context in which it is used." *W. Va. Health Care Cost Rev. Auth. v. Boone Mem. Hosp.*, 196 W. Va. 326, 338, 472 S.E.2d 411, 423 (1996) (citations omitted).

Applying the above-mentioned principles of statutory construction, the plain, ordinary meaning of the word "ancestry" is defined as "[a] line of descent; collectively, a person's forebears; lineage." *Ancestry*, Black's Law Dictionary (11th ed. 2019); *see also Ancestry*, Webster's New World College Dictionary (5th ed. 2014) ("family descent or lineage."). Here, petitioners' attempt to shoehorn their claims into this basic definition of "ancestry" must fail because siblings are not lineal descendants. More broadly stated,

15

where family status does not involve lineal descent, it does not fall within the protected class of "ancestry" in the context of employment discrimination, W. Va. Code § 5-11-2.

Further, contrary to the petitioners' argument that ancestry must be viewed separately and distinctly from the other protected classes set forth in the Act,[7] we cannot look at the term "ancestry" in isolation to ascertain its meaning "but it must be drawn from the context in which it is used." *W. Va. Health Care Cost Rev. Auth.*, 196 W. Va. at 338, 472 S.E.2d at 423. The United States District Court for the Southern District of West Virginia addressed this statutory concept in *Billiter v. Jones*, No. CV 3:19-0288, 2020 WL 5646901 (S.D.W. Va. Sept. 22, 2020), which was relied upon by the circuit court in reaching its decision. In *Billiter*, the plaintiff's counsel (petitioners' counsel herein), asserted that plaintiff Lauren Billiter, a deputy clerk in the Mason County Circuit Clerk's Office, was terminated from her employment in violation of the Act after her mother ran for circuit clerk and lost. *Id*. at *1. More specifically, the plaintiff argued that her claim

---

[7] The petitioners argue, albeit somewhat indirectly, that any determination that ancestry includes characteristics of ethnicity or national origin would render the word to be mere surplusage in the Act. *See Lightner v. Riley*, 233 W. Va. 573, 580, 760 S.E.2d 142, 149 (2014) ("A court may not interpret a statute such that the result is to make the statute meaningless since one of the basic principles of statutory construction is that the Legislature will not enact a meaningless statute."). We reject this argument; a determination that ancestry has characteristics of other words used in the statute, i.e., national origin or ethnicity, does not require this Court to "interpret" the statute, thereby rendering it meaningless and inoperable. *See id*.

16

fell within the Act's prohibition of discrimination based on "ancestry" due to her familial relationship with her mother.[8]  *See id*.

First, the district court acknowledged that "West Virginia's Human Rights Act does not define the word 'ancestry,' nor does any decision of the West Virginia Supreme Court of Appeals."  *Id*. at *6.  Further, the court rejected arguments that ancestry was identical to ethnicity or national origin, finding that it did "not believe that the including of 'ancestry' in the Human Rights Act is merely redundant or meaningless."  *Id*.

The district court turned to the constructs established by this Court in *Barefoot v. Sundale Nursing Home*, 193 W. Va. 475, 457 S.E.2d 152 (1995) (discussing alleged discrimination based on "Native American ancestry"), and *Fairmont Specialty Services v. West Virginia Human Rights Commission*, 206 W. Va. 86, 522 S.E.2d 180 (1999) (discussing alleged discrimination based on "Mexican-American ancestry"), which the court described as "suggest[ing] that ancestry is a meaningful part of the act. Discrimination based on ancestry means discrimination based on some type of characteristic like race, ethnicity, or national origin that is passed down by lineal

---

[8] The plaintiff also argued that she was discriminated against because of her mother and her mother's political affiliation.  *See Billiter*, 2020 WL 5646901, at *1.

17

ascendants."[9]  2020 WL 5646901, at *6.  The court relied upon the following analysis by

this Court in *Fairmont Specialty Services*:

> In *Fairmont Specialty Services*, the West Virginia Supreme Court of Appeals upheld an award to a plaintiff who alleged harassment based on her ancestry. *Fairmont Specialty Servs.*, 522 S.E.2d at 183. Specifically, the plaintiff was "a United States citizen of Mexican ancestry." *Id.* at 184. There the plaintiff complained that a coworker made derogatory remarks relating to her being "a Mexican," *Id.* at 183-88. The Court explicitly discussed how this is the kind of language that is actionable under the anti-discrimination laws like the Human Rights [Act]. *Id.* at 188.
>
>> Conduct such as use of the "N" word to describe an African-American, the "C" word to describe women, the terms "Sic," "W.P." or "Jap" to describe those of other ancestral heritages, or other racial, sexual or ethnic pseudonym, intended to denigrate others, cannot be tolerated in the workplace. They are the type of outrageous discriminatory conduct that may be considered to be of an aggravated nature such that the threshold for it to be actionable is much lower than more subtle forms of discrimination which cumulatively cause conduct to be actionable under the Human Rights Act.
>
> *Id.* at 188 n.8.
>
> This kind of actionable discrimination relates to innate characteristics that are shared by a class of persons. This can be seen in the other protected classes under the West Virginia Human Rights Act. W.Va. Code § 5-11-2 ("Equal opportunity in the areas of employment and public accommodations is hereby declared to be a human right or civil right of all persons

---

[9] For example, in *Barefoot* this Court described the plaintiff's claim as "racial or ancestral discrimination" based on her Native American heritage. 193 W. Va. at 484-85 n.13, 457 S.E.2d at 162-63 n.13.

18

without regard to race, religion, color, national, origin, ancestry, sex, age, blindness or disability.").

*Billiter*, 2020 WL 5646901, at *7.

The district court in *Billiter*, citing the same principles of statutory construction that we now apply, determined that "the meaning of 'ancestry' should be understood to mean something akin to the words surrounding it, the other grounds upon which discrimination is forbidden under the West Virginia Human Rights Act." *Id*. (citing, in part, *Darlington v. Mangum*, 192 W. Va. 112, 114, 450 S.E.2d 809, 811 (1994) ("'It is a fundamental rule of construction that, in accordance with the maxim *noscitur a sociis*, the meaning of a word or phrase may be ascertained by reference to the meaning of other words or phrases with which it is associated. Language, although apparently general, may be limited in its operation or effect where it may be gathered from the intent and purpose of the statute that it was designed to apply only to certain persons or things, or was to operate only under certain conditions.' Syllabus point 4, *Wolfe v. Forbes*, 159 W.Va. 34, 217 S.E.2d 899 (1975).")). The court granted the defendants' motion for summary judgment on the ancestry claims, concluding that neither the plaintiff nor her mother's political affiliation or familial status was the "kind of innate characteristic that anti-discrimination laws like the West Virginia Human Rights Act were enacted to protect." 2020 WL 5646901, at *7.

In light of the foregoing, we hold that as used in the West Virginia Human Rights Act, West Virginia Code § 5-11-2 (2022), ancestry means discrimination based on some characteristic like race, ethnicity, or national origin that is passed down by lineal descendants. In the context of employment, familial status is not included among the groups entitled to protection by the Human Rights Act. The petitioners' claim that they were terminated because of their familial status with their sister, Ms. Taylor, is not actionable under the Act because familial status is not a prohibited basis for discrimination in the employment context under the Act and does not fall within the meaning of ancestry as used in the Act. Therefore, the circuit court did not err in granting the CCDC's motion for summary judgment on this issue.

## B. Implied Contract

The petitioners' remaining assignments of error overlap and are repetitive. They argue that the circuit court erred: 1) in finding that the Employment Guide did not form a contract between the petitioners and the CCDC, 2) in holding that even if a contract had been formed, the CCDC was within its rights to terminate them pursuant to other terms of the Employment Guide; and 3) in finding that the petitioners were at-will employees who could be terminated for any nondiscriminatory reason. At its core, the petitioners contend that that they were not at-will employees because the Employment Guide created an implied contract between them and the CCDC that prevented the CCDC from terminating them without following the progressive disciplinary policies set forth in the

20

Employment Guide.[10]  Conversely, the CCDC argues that the petitioners were at-will

employees who could be terminated for any nondiscriminatory reason and who cannot

prevail on their breach of contract theory.

"In West Virginia, the law presumes employment to be terminable at will."

*Suter v. Harsco Corp.*, 184 W. Va. 734, 737, 403 S.E.2d 751, 754 (1991);  *see Williams v.*

*Precision Coil, Inc.*, 194 W. Va. 52, 63, 459 S.E.2d 329, 340 (1995) ("As a general rule,

West Virginia law provides that the doctrine of employment-at-will allows an employer to

discharge an employee for good reason, no reason, or bad reason without incurring liability

unless the firing is otherwise illegal under state or federal law.").  Further, the petitioners

have the burden to defeat the presumption of at-will employment.  *Suter*, 184 W. Va. at

737, 403 S.E.2d at 754 ("The burden is on the party contending that the relationship was

other than terminable at will to rebut the presumption of employment terminable at will.").

A "party asserting that an employment was other than at-will bears the burden of rebutting

the at-will presumption." *Younker v. E. Associated Coal Corp.*, 214 W. Va. 696, 700, 591

S.E.2d 254, 258 (2003). This burden is heavy one that must be established by clear and

convincing evidence, as we held in syllabus three of *Adkins v. Inco Alloys Int'l, Inc.*, 187

[10]The petitioners also contend that "no part of the handbook or any associated documentation asked the employees at CCDC to acknowledge that they were at-will or purported to limit the employees' reliance on the terms and guarantees set forth by the handbook[,]" and the "CCDC employees were never asked to acknowledge that they were employees at-will."  However, they provide no legal authority for the proposition that the employer is required to have the employees "acknowledge" their at-will employment status.  Further, for reasons discussed *infra* in greater detail, these claims are without merit.

21

W. Va. 219, 417 S.E.2d 910 (1992): "Where an employee seeks to establish a permanent employment contract or other substantial employment right, either through an express promise by the employer or by implication from the employer's personnel manual, policies, or custom and practice, such claim must be established by clear and convincing evidence."

*Id*. In regard to the at-will employee presumption, we explained in *Suter* that

> [i]f the presumption in West Virginia were against employment terminable at will, an employer seeking to create an employment at will relationship would have to disclaim guarantees of job security in a very bold and definite way, perhaps with language such as "Employees serve at the will and pleasure of the employer and can be fired at any time and without any notice, for any reason or no reason at all." However, because we operate on the opposite presumption— that is, that every employment relation is terminable at will, any promises alleged to alter that presumptive relationship must be *very definite* to be enforceable.

184 W. Va. at 737, 403 S.E.2d at 754.

Here, the petitioners acknowledge the at-will employment status presumption. *See Mace v. Charleston Area Med. Ctr. Found., Inc.*, 188 W. Va. 57, 63, 422 S.E.2d 624, 630 (1992) ("In West Virginia, the law presumes that employment is terminable at will, permitting an employer to discharge an employee for cause, for no cause, or even for wrong cause."). However, they argue that an implied contract existed between them and the CCDC due to "the various rights created by the handbook for [the CCDC's] employees, particularly those protecting its employees from dismissal without following handbook procedures, . . . coupled with the CCDC handbook's promises regarding the terms and conditions of Petitioners' employment[.]"

22

The parties do not dispute that "an employee handbook may form the basis of a unilateral contract if there is a definite promise therein by the employer not to discharge covered employees except for specified reasons." Syl. Pt. 6, *Cook v. Heck's Inc.*, 176 W. Va. 368, 342 S.E.2d 453 (1986); *accord Williams*, 194 W. Va. at 56, 459 S.E.2d at 333, Syl. Pt. 5; *see Cook*, 176 W. Va. at 369, 342 S.E.2d at 454, Syl. Pt. 3 ("Contractual provisions relating to discharge or job security may alter the at will status of a particular employee."). Further,

> *[a] promise of job security* contained in an employee handbook distributed by an employer to its employees constitutes an offer for a unilateral contract; and an employee's continuing to work, while under no obligation to do so, constitutes an acceptance and sufficient consideration to make the employer's promise binding and enforceable.

*Id*. at 369, 342 S.E.2d at 454, Syl. Pt. 5 (emphasis added); *accord Williams*, 194 W. Va. at 56, 459 S.E.2d at 333, Syl. Pt. 4. However, "[a]n employee handbook which contains a clear and conspicuous disclaimer of job security will preserve the at-will status of the employment relationship." *Mace*, 188 W. Va. at 59, 422 S.E.2d at 626, Syl. Pt. 8. Further, "[a]n employer may protect itself from being bound by any and all statements in an employee handbook by placing a clear and prominent disclaimer to that effect in the handbook itself." *Suter*, 184 W. Va. at 735, 403 S.E.2d at 752, Syl. Pt. 5.

Based on our careful review of the petitioners' evidence, we agree with the circuit court's conclusion that the petitioners failed to carry their burden of proving the existence of an implied employment contract between them and the CCDC. The language

23

of the Employment Guide contains neither a promise of job security nor a term of employment. To the contrary, the Employment Guide specifically provides the following in regard to "Tenure of Employment": "As most Federal/State Funds are appropriated on a yearly basis, no guarantee of employment can be made beyond the grant period." Further, and significantly, on the third page of the Employment Guide is the following language: "**Note-Receipt of this Employment Manual does not constitute an employment contract with this agency**."

Notwithstanding the foregoing, the petitioners base their implied contract claim on the progressive disciplinary procedure language contained in the Employment Guide; their position is that this procedure was a mandatory condition precedent to their termination. However, this argument completely ignores the fact that pursuant to express language in the Employment Guide, involuntary termination may occur for several different reasons, including "circumstances beyond the employee's control," which include insufficient funding and "reorganization and discontinuance of a particular position or area of service." Where these circumstances exist, a termination from employment is a "positive termination" which fails to trigger any progressive disciplinary procedure pursuant to the Employment Guide. Accordingly, the petitioners' argument in regard to the progressive disciplinary procedure creating an implied contract fails for lack of a "definite promise not to discharge covered employees except for a specified reasons." *See Cook*, 176 W. Va. at 369, 342 S.E.2d at 454, Syl. Pt. 6, in part.

24

In consideration of the foregoing, we find that that the circuit court did not err in its determination that the language of the Employment Guide failed to support the petitioners' claim that the language formed an implied employment contract. *See* Syl. Pt. 2, *iPacesetters, LLC v. Douglas*, 239 W. Va. 820, 806 S.E.2d 476 (2017) ("It is the province of the court, and not of the jury, to interpret a written contract." Syl. Pt. 1, *Stephens v. Bartlett*, 118 W. Va. 421, 191 S.E. 550 (1937).").

Further, the petitioners failed to carry their burden by not producing any other facts tending to show that an implied contract existed. In this regard, it is undisputed that the petitioners had a copy of the Employment Guide and that neither petitioner, when questioned during their respective depositions, denied the existence of the disclaimer language in the Employment Guide.[11] Also, when specifically questioned, neither petitioner could identify any language in the Employment Guide upon which they respectively relied to support their claim that an employment contract existed between them and the CCDC.

The parties agree that the petitioners "did not commit any offense that would lead to immediate termination as identified in the Guide[.]" However, the petitioners failed to produce any evidence to refute the CCDC's evidence that they were involuntarily

---

[11] We agree with the CCDC that because neither petitioner denied the existence of the disclaimer contained in the Employment Guide when specifically questioned, they cannot now claim that the disclaimer was "not conspicuous."

25

terminated under the "Insufficient Funding and Reorganization and Discontinuance of a Particular Position or Area of Service" categories within the "Positive Dismissal" section in the Employment Guide because their termination arose out of circumstances beyond their control, i.e., the CCDC's financial situation. The petitioners' positions were dissolved, their work duties were easily absorbed by others, and the dissolution of their positions resulted in a savings to the nonprofit organization in excess of $115,000.00 per year. Additionally, Ms. Duffield, then-CCDC Executive Director, testified as the CCDC's 30(b) designated representative that the petitioners were terminated because they "were at-will employees. And our agency had to make some tough decisions. We were a quarter of a million dollars in debt and we had to terminate the positions that were the most easily absorbed. We had to make some tough decisions." Ms. Duffield further explained that the petitioners did not have as many duties and responsibilities as most of the other employees, and therefore their jobs were easily absorbed. Ms. Duffield confirmed that the petitioners' dissolved positions were never reconstituted. Critically, the petitioners failed to offer any evidence to rebut Ms. Duffield's testimony, Ms. McGlothlin's affidavit, or the CCDC's position in regard to their termination. To the contrary, the petitioners testified that they had no knowledge of the financial condition of the CCDC.

In short, the petitioners provided no evidence to support their claim that they were not at-will employees. *See Adkins*, 187 W. Va. at 220, 417 S.E.2d at 911, Syl. Pt. 3. Thus, they have failed to prove by clear and convincing evidence that the Employment Guide formed the basis of a contract containing definitive and ascertainable terms

26

applicable to each of them, which would be required in order for the petitioners to prevail on their claim that an implied contract existed in this case. *See id*. The circuit court did not err in its finding that "the Plaintiffs were at-will employees, and as such could be terminated for any non-discriminatory reason."

## IV. Conclusion

For the foregoing reasons, the circuit court's March 5, 2021, order granting summary judgment to the CCDC and dismissing the case from the court's docket is affirmed.

Affirmed.

27